THE STATE OF OHIO, APPELLEE, *v.* ZUERN, APPELLANT.

[Cite as State *v.* Zuern (1987), 32 Ohio St. 3d 56.]

(No. 86-1130—Decided August 12, 1987.)

*Arthur M. Ney, Jr.,* prosecuting attorney, and *William E. Breyer,* for appellee.

*Robert R. Hastings, Jr.,* and *Robert V. Wood,* for appellant.

HOLMES, J. We begin our analysis of this appeal by considering the specific issues raised concerning the proceedings below. In his first proposition of law, appellant urges that the trial court committed prejudicial error by denying his request to have the jury view the crime scene, *i.e.,* the maximum security cell. He contends that such a viewing would have aided the trier of fact to better understand the testimony concerning the size of the cell and its relative location. This argument is without foundation in that, accepting appellant's statements as true, no connection is demonstrated between the denial of such request and any particular impact upon appellant's defense. It is simply not enough to assert, as essential, "that the defense have every opportunity to defend against the charges to the fullest extent."

Also, the trial court is vested with a broad discretion in such matters, and its judgment will not be disturbed absent an abuse of discretion. *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 253, 15 OBR 379, 391, 473 N.E. 2d 768, 780; *Calloway* v. *Maxwell* (1965), 2 Ohio St. 2d 128, 31 O.O. 2d 196, 206 N.E. 2d 912. In the case before us, various photographs of the cell block were given to the jury which, along with descriptive testimony, accurately portrayed the cells involved. Further, it was also brought to the court's attention that the area in question housed the more dangerous prisoners and that moving them to accommodate the jury view would create additional hazards. It was noted that prisoners had, on past occasions, subjected visiting jurors to verbal abuse. Since no observable aspect of the defense depended on anything physically present at the correctional institute, it cannot be said that the court abused its discretion.

Appellant also asserts that the trial court erred in failing to declare a mistrial because of an allegedly prejudicial statement made by one of the state's witnesses. One of appellant's fellow inmates, Wayne Lewis, testified that he observed appellant fashioning his dagger, that the appellant had the weapon over the course of several days, and that the appellant had expressed a general animosity toward the prison guards.

The transcript reveals the following transpired during Lewis' testimony:

"A. I told Officer Doyle, 'Officer Doyle, can we talk, could we rap? I'm telling you, you know, Zuern has a shank or a knife or whatever you want to call it.' I said, 'He is crazy, man. He is in here for murder, and he won't hesitate to do it again.' He said ——.

"Mr. Wood: If your Honor please, that was not in the presence of the defendant. At this time I will move for a mistrial."

Thereafter, both counsel and the trial court held a side-bar conference out of the hearing of the jury. The trial court then informed the jury that the testimony in question was a "gratuitous remark" by the witness and it was to be excluded as evidence from their consideration. Certainly the testimony alleging that appellant had a pending murder charge at the time of the instant offense was improper. However, it should be noted that the prosecution did not elicit the comment in question and it was volunteered by one not connected with law enforcement. Furthermore, the prosecution avoided all references to this information during the trial and made no comments upon it during arguments to the jury. It does not appear that the prosecution could reasonably have anticipated the witness' comment.

Despite the jury instruction, appellant contends that the error was clearly prejudicial and could not be cured by a mere jury instruction. He quotes from *State* v. *Hector* (1969), 19 Ohio St. 2d 167, 48 O.O. 2d 199, 249 N.E. 2d 912, and from Evid. R. 404(B) which states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." This rule, commonly referred to as the "propensity rule," constitutes a standing bar, upon the ground of irrelevancy, to any attempt to prove the commission of the crime charged by evidence of a like previous act. See, *e.g.,* 42 Ohio Jurisprudence 3d (1983), Evidence and Witnesses, Section 206. While ordinarily not rising to the level of constitutional significance, the introduction of such evidence may be highly prejudicial (Evid. R. 403) when the former crime or act is utilized in a subsequent trial which has, as its central issue, the question of whether the defendant committed the same kind of act. See, *e.g., State* v. *Allen* (1987), 29 Ohio St. 3d 53, 55, 29 OBR 436, 438, 506 N.E. 2d 199, 201.

It is contended that the case *sub judice* is such a case and that mention of the prior murder charge so inflamed the jurors' thinking processes that they could no longer be presumed to have adhered to their oaths, wherein they swore to decide the case on the merits of the evidence. The issue which appellant put before the jury was not whether appellant murdered Officer Pence, but, rather, conceding that he in fact so murdered the officer, whether the act was done with such prior calculation and design as to constitute *aggravated* murder. This issue was contested by evidence of acts prior to and after the actual murder, as well as characterizations of those acts comprising the murder itself. Since the *issue* of murder was not before the jury, but in fact was admitted, it can hardly be contended that mention of a prior murder charge would have given rise to the danger that a jury might infer that he again so murdered. Strictly speaking, therefore, we are not confronted with propensity evidence, *i.e.,* a prior murder used to prove a subsequent murder. Moreover, the fact that appellant admitted the murder of Pence surely overshadowed and thus blunted any shock potential which may have been

created by mention of the prior murder charge.

It is nevertheless argued that the revelation of the prior murder charge by the witness was prejudicial error, affecting the outcome of the trial. This necessarily asserts that something about this information created bias in the jurors. Such a presumption ordinarily has a high threshold, which is not attainable, in a case like the one before us, without a demonstration that such added information achieved a probable shocking impact upon the jurors.

It is very doubtful that information of the kind at issue had such impact, where, as the record shows here, the jurors were scrupulously examined on *voir dire* as to whether they had heard or read any pre-trial publications concerning appellant. Almost all of them, ten as a matter of fact, answered in the affirmative. Counsel for the state as well as for appellant, after obtaining such answers, then inquired as to whether the jurors had formed an opinion from the facts revealed and whether the jurors could decide the case on the evidence alone. The jurors each answered in the negative as to the first question and in the affirmative as to the second. Also, both sides had occasion to instruct the prospective jurors not to go into any particular facts which they may have read, but only to state whether such facts would influence their ultimate decision. All of the trial participants, whether or not they stated an awareness that appellant had been arrested and was being held for aggravated murder, took the oath which specifically obligated them to disregard whatever they had heard or read and made them keenly aware that they were not to allow any extraneous matters to enter into their considerations. Unless it is pointedly shown otherwise, we should assume, under the facts of this case, that the members of the jury had followed their oaths.

We feel it is reasonable to state that a juror's knowledge concerning the existence of certain facts is separable from the juror's capability to act impartially in considering matters presented to him for determination. While trial courts rather uniformly seek to control juror knowledge in order to prevent bias, it is a fact of life that a great many trials occur in communities where significant and potentially prejudicial facts are made known about the defendant. Such knowledge does not preclude a fair trial where, as here, the jurors in response to specific queries state their willingness to decide the case fairly and impartially.

Finally, even assuming that error may appear, the United States Supreme Court has stated that whenever the other untainted evidence is overwhelmingly in support of a conviction, then the effect of the tainted material is presumed harmless. *Harrington* v. *California* (1969), 395 U.S. 250, 254. Such rule is applicable even to errors of constitutional dimension, *United States* v. *Hasting* (1983), 461 U.S. 499, 508, and certainly to cases as the one now before us where the error alleged does not directly impact upon a constitutional rule but is, at most, mere trial error.

This view was founded upon the basically sound observation that "taking into account the reality of a human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and that the Constitution does not guarantee such a trial." (Citations omitted.) *Id.* at 508-509. This court expressly adopted the above views in *State* v. *Williams* (1983), 6 Ohio St. 3d 281, 6 OBR 345, 452 N.E. 2d 1323, paragraph six of the syllabus, wherein we stated that error is harmless "if the remaining

evidence, standing alone, constitutes *overwhelming* proof of defendant's guilt." (Emphasis added.)

There can hardly be a more exemplary case of "overwhelming proof" than the case now before us. Appellant was observed by various witnesses to have committed the killing, under circumstances which leave no doubt whatsoever as to his identity. He was observed prior to the crime preparing a specialized killing tool. After the crime, he was heard to state his views concerning his intent and lack of remorse. He explained that the loop on the end of the shank was for his little finger, to keep a firm grip on the weapon. He also indicated that he had prior knowledge of the impending search. A great deal of additional, but less noteworthy, inculpatory evidence also went before the jury. On the other hand, appellant rested his case without presenting any evidence. As previously mentioned, appellant admitted that he committed the killing with a culpability level of at least murder. This the jury could fairly consider.

To assert that the jury was hopelessly prejudiced by the witness' mention of the prior murder arrest, under the facts of this case, would be tantamount to creating a *per se* rule of exclusion whenever such event occurs, since a stronger case against a defendant could hardly be imagined. Such a conclusion not only undermines the presumption of the effectiveness of the trial court's curative instructions, but it also calls into question the effectiveness of the jurors' oaths. See, *e.g., State* v. *Ferguson* (1983), 5 Ohio St. 3d 160, 5 OBR 380, 450 N.E. 2d 265. Consequently, we find no error worthy of reversal.

Appellant next asserts that prejudicial error occurred when the trial court failed to *sua sponte* dismiss juror Taylor after she revealed that she had overheard a news broadcast concerning the case in which the prior murder charge had been mentioned. The following discussion, held outside the presence of the jury, forms the basis of appellant's contention:

"The Court: You heard something on TV?

"Juror No. 9: Yes, this morning. I just happened to overhear it. I would rather not be involved.

"* * *

"Mr. Ney: You think that would interfere with your consideration of this case, to be fair and impartial?

"Juror No. 9: Not to be fair. I could be fair. I would just rather not, I'm sorry.

"Mr. Ney: When did you overhear this?

"Juror No. 9: This morning.

"Mr. Ney: At what time?

"The Court: Do you know what station?

"Juror No. 9: I think it was Channel 12.

"Mr. Ney: Was it concerning this case?

"Juror No. 9: Yes.

"Mr. Ney: Was it concerning the defendant and the state.

"Juror No. 9: Yes, it mentioned him.

"The Court: Mr. Wood, do you have any questions that you would like to ask?

"[Appellant's Counsel]; I haven't heard any reason yet. I know the lady is upset.

"The Court: She said that she heard something about the case on Channel 12 this morning.

"[Appellant's Counsel]: But she said that wouldn't affect her decision in this case?

"Juror No. 9: It wouldn't affect my decision.

"[Appellant's Counsel]: What did you hear?

"Juror No. 9: I heard a version of

what happened, *why he was in there in the first place,* that he had been there previous, and that upset me, but I could be fair. I want to be fair. I am sorry. I will serve. I could be impartial, yes.

"The Court: But you would rather not?

"[Appellant's Counsel]: Do you think that what you heard this morning about defendant would so influence you that you couldn't serve?

"Juror No. 9: No, no. I am hoping not. What is fair, I will do. I will be fair. But I also want to be honest.

"* * *

"The Court: Will you give it another day's try?

"Juror No. 9: Sure, I will. I will be glad to.

"[Appellant's Counsel]: We would appreciate it.

"Mr. Ney: We would rather that you stay.

"Juror No. 9: I will." (Emphasis added.)

On the following day, counsel for appellant moved for either a mistrial or, alternatively, the removal of juror Taylor. This was premised upon his discovery that the news broadcast in question alleged that fellow inmates referred to appellant as "a crazy killer." The trial court permitted additional examination of juror Taylor, during which she denied that she had heard anything other than the information regarding the prior murder charge. Thereafter, the motion for mistrial was overruled and the trial continued with Taylor serving as a juror.

Because the juror stated that she did not hear any news reports containing the statements of other inmates, and appellant's reputation among them, we have only to consider her knowledge of the prior arrest for murder. The juror, of course, affirmed her willingness to reach a decision impartially and stated that the above knowledge had not affected her decision to be fair. Not only did counsel for appellant fail to request the juror's removal after *voir dire* on that issue, but he indicated an affirmative desire that she continue on the case. This constitutes an express waiver of any alleged error. See *State* v. *Fanning* (1982), 1 Ohio St. 3d 19, 1 OBR 57, 437 N.E. 2d 583; *State* v. *Williams* (1977), 51 Ohio St. 2d 112, 5 O.O. 3d 98, 364 N.E. 2d 1364. Further, all of the jurors had already been instructed to disregard that very information when it was broached by the prior witness. The jury already knew the information at issue. Therefore, under the circumstances, there was no plain error. Crim. R. 52(B).

Appellant also asserts that the evidence was insufficient to support a determination that he acted with prior calculation and design. The record demonstrates otherwise. Not only did appellant express hostility in general toward the guards prior to the incident, but he also fashioned the murder weapon in a manner useful for inflicting death or serious injury. The act of bending this specially hardened steel into the desired shape, including a loop on one end to prevent it from slipping out of the hand, demonstrates a determined effort days before the event. That he sharpened it to a very fine edge for hours at a time is also evidence of intent formed prior to the killing. It was further demonstrated that appellant had advance notice of the search but did nothing to conceal the weapon. Instead, he waited in ambush. When the cell door opened, appellant's unprovoked acts of lunging and stabbing the guard were clearly deliberate. Moreover, after the killing, appellant not only failed to express remorse, but he told another that he received particular gratification from the killing, and demonstrated how he

used, pursuant to his plan, body leverage to force the weapon deeper into the officer's chest.[2]

We have reviewed the entire record, weighed the evidence and all reasonable inferences, and considered the credibility of the witnesses to the extent permissible on appellate review. It can only be concluded that the verdict of aggravated murder, done with prior calculation and design, is fully supported by the evidence. The jury clearly did not lose its way and create such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Tibbs* v. *Florida* (1982), 457 U.S. 31; *State* v. *Robinson* (1955), 162 Ohio St. 486, 55 O.O. 388, 124 N.E. 2d 148; *State* v. *Martin* (1986), 21 Ohio St. 3d 91, 21 OBR 386, 488 N.E. 2d 166.

Appellant has also raised nine constitutional challenges to the death penalty statute, most of which have been previously resolved. He failed to raise specific constitutional challenges by written or oral motion. Instead, at the conclusion of the state's presentation of evidence, defendant entered a general oral objection in order to reserve any and all rights he possessed under the federal and state Constitutions. The state asserted, and the court of appeals agreed, that this procedure constituted a waiver of appellant's constitutional challenges.

Generally, the law in Ohio is that the failure to raise the issue of a statute's constitutionality at the trial level constitutes a waiver of such issue. *State* v. *Awan* (1986), 22 Ohio St. 3d 120, 22 OBR 199, 489 N.E. 2d 277. The acceptable procedure is to raise any constitutional challenges to the death penalty statute by way of specific motions, with the opportunity for the state to respond and the trial court to rule on said motions. However, because of the nature of the case and the exacting review necessary where the death penalty is involved, we reserve the right to consider the constitutional challenges in particular cases.

Appellant challenges the use of one jury in a bifurcated proceeding as a denial of effective assistance of counsel. This procedure has been explicitly approved of and is constitutionally permissible. *State* v. *Mapes* (1985), 19 Ohio St. 3d 108, 117, 19 OBR 318, 325, 484 N.E. 2d 140, 148; *Lockhart* v. *McCree* (1986), 476 U.S. ___, 90 L. Ed. 2d 137, 152.

Appellant next urges that the underlying felony cannot form the basis of an aggravating circumstance, because such a procedure fails to narrow the class of offenders. This argument has been previously rejected in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 178, 15 OBR 311, 323, 473 N.E. 2d 264, 280; see, also, *Jurek* v. *Texas* (1976), 428 U.S. 262.

Appellant also asserts that there is no rational basis for the penalty of death, inasmuch as there is no penological justification. This court has already held that the statutory scheme imposing the death penalty is constitutionally permissible. *State* v. *Jenkins, supra,* at 168, 15 OBR at 314, 473 N.E. 2d at 272-273. See, also, *Gregg* v. *Georgia* (1976), 428 U.S. 153.

It is further alleged that the death penalty is arbitrary and capricious because the slightest outweighing of aggravating circumstances over mitigating factors invokes the death penalty. Also, it is alleged that the im-

---

[2] There was testimony that appellant "* * * felt good [and] got his nut * * * after a stabbing." He was heard to state as his reason for refusing to take the witness stand that he would reveal his true feelings about the event which he characterized as: "'What the * * * [expletive], I killed him, who cares.'"

position process does not permit the extension of mercy. These contentions are without merit, and have been previously resolved. *Jenkins, supra; State* v. *Buell* (1986), 22 Ohio St. 3d 124, 139, 22 OBR 203, 216, 489 N.E. 2d 795, 809. Moreover, a jury is not precluded from extending mercy to a defendant. Appellant also challenges the sentencing scheme, urging the addition of several other considerations. However, the statute has been found to be constitutionally sufficient. *Jenkins, supra.*

Appellant asserts that his sentence lacks *proportionality* in comparison with those similarly situated. We are also compelled by R.C. 2929.05(A) to determine whether the sentence imposed is proportional and appropriate in this case. This court has never held that a proportionality review requires equal treatment of all capital defendants. The variety of reasons the state seeks the death penalty in a case, as well as the many varying mitigation factors, precludes such a possibility. The purpose of a proportionality review is therefore to insure that the death penalty is not imposed in a random, freakish, arbitrary, or capricious manner. *Gregg, supra.* We note that the penalty of death was upheld in prior cases where the murder victim was a peace officer. See, *e.g., State* v. *Glenn* (1987), 28 Ohio St. 3d 451, 28 OBR 501, 504 N.E. 2d 701. After a review and comparison of previous convictions, wherein capital punishment was imposed, it is concluded that the sentence of death in this case is neither excessive nor disproportionate to the penalty imposed in similar cases. See, also, *State* v. *Barnes* (1986), 25 Ohio St. 3d 203, 212-213, 25 OBR 266, 274, 495 N.E. 2d 922, 929. Also, viewing the record in its entirety, and in the context of previous aggravated murder cases, it can only be concluded that the sen-

tence of death in the case before us is fully appropriate.

Appellant also contends that Crim. R. 11(C)(3), which permits a trial court to dismiss specifications in the interest of justice where a defendant pleads guilty but does not allow such a result where defendant pleads not guilty, is unconstitutional because it encourages guilty pleas. *United States* v. *Jackson* (1968), 390 U.S. 570. This issue has been resolved by this court in *Buell, supra,* at 138, 22 OBR at 215, 489 N.E. 2d at 807-808. Further, the application of Crim. R. 11(C)(3) is not in issue in the instant case. Therefore, appellant's contention is found to be without merit.

Finally, appellant challenges the constitutionality of the statute on the basis that it is applied disproportionately to those whose victims are white as opposed to those whose victims are black. The statistical basis of appellant's analysis is the mere fact that there were more white victims in Ohio, almost twice as many in fact. He concludes upon this basis that "defendants who kill white victims are twice as likely to face the death penalty as those who are convicted of killing blacks."

The United States Supreme Court has recently resolved this issue in *McCleskey* v. *Kemp* (1987), 481 U.S. ____, 95 L. Ed. 2d 262. In that case a complete multiple regression analysis was presented on behalf of the defendant who was a black male convicted, apparently upon strong circumstantial evidence, of killing a white police officer during a robbery. The study examined all murder cases in Georgia during the 1970s and concluded that "black defendants * * * who kill white victims have the greatest *likelihood* of receiving the death penalty." (Emphasis added.) *Id.* at 275. Asserting at 278 that "a criminal defendant must prove that the purposeful discrimina-

tion 'had a discriminatory effect' on him, *Wayte* v. *United States,* 470 U.S. 598, 608 (1985)," the court concluded at 281-282 that the statistical study was insufficient to prove in a criminal case that race was a factor in any particular murder prosecution, including that of McCleskey. Furthermore, the court expressly upheld the need for sentencing discretion and essentially stated that the standards enunciated in *Furman* v. *Georgia* (1972), 408 U.S. 238, and *Gregg* v. *Georgia* (1976), 428 U.S. 153, "necessarily require * * * discretionary judgments." *Id.* at 281. It was found that the above study fell far short, and at best only demonstrated a risk that the factor of race may have entered into some capital sentencing. *Id.* at 277, fn. 7.

There are, of course, a number of considerations which force the conclusion that the claim before us is weaker than that presented in *McCleskey*. Appellant's prisoner record indicates that he is white, which would reduce the power of any suggestion that he was penalized for killing a white victim. Also, it was admitted in *McCleskey* that " '[w]hen the cases become tremendously aggravated so that everybody would agree that * * * these are the cases that should get * * * [the death penalty], the race effects go away. It's only in the mid-range of cases where the decision makers have a real choice as to what to do. * * * '" *Id.* at 275, fn. 5, quoting the expert testimony before the district court. The case *sub judice* is, it seems, more of a "tremendously aggravated" one, as are nearly all of those capital punishment cases which this court has reviewed to date. Moreover, Ohio's system well documents why particular murderers receive the death sentence, which has removed the vestiges of arbitrariness.

Appellant's analytical approach is flawed for several reasons. Obviously, the mere existence, without more, of twice as many white victims, does not invariably force the conclusion that one who kills whites has a greater chance of receiving the death penalty. There are other possible causes, some of which are fully sufficient to explain the disparity. For example, we are not told how many of the murderers are white, black, Hispanic, or other. We also have not been pointed to any statistics demonstrating the relationships, if any, between the race of the murderer and the race of the victim.

In point of fact, an inquiry into the state public defender's report, issued in January 1987, demonstrates that approximately one half of the victims counted were killed by white murderers. Actually, in Ohio, the largest sub-category of murderers on death row are white murderers who killed white victims. The next largest are black murderers who killed black victims. These sub-categories account for nearly four-fifths of all murderers currently under the death sentence. The implication seems rather difficult to avoid that a mere counting of victims and offenders by race reveals almost no basis to imply a probability that the race of the victim played any part in the sentencing.

Most importantly of all, appellant has failed to demonstrate specific discriminatory intent, which alone is proof that actual discrimination occurred in the sentencing process. Mere hypothetical probability is no substitute in a criminal proceeding for proof of specific facts. It therefore becomes clear that race of the victim has not been shown to play a part in imposition of the death penalty by Ohio courts. Also, the over three hundred other Ohio murder cases wherein the death penalty was sought were resolved by sentences which did not include capital punishment. Sentencing discretion, which is an absolute re-

quirement in any constitutionally acceptable capital punishment statute, has apparently been exercised prudently.

Having discovered no constitutional error, the court must independently review and weigh the aggravating circumstances against the mitigating factors pursuant to R.C. 2929.04(B). We begin by noting that appellant declined to place any new evidence of mitigation before the jury, but instead read to the court his statement which asserted, in pertinent part:

"I am fully aware that if I do not offer any evidence in mitigation, the jury can come to but one decision, that being death by electrocution.

"I have no 'death wish' and I do not wish to die; however, it is not my nature to beg or crawl. In light of all the circumstances, I wish to maintain my self respect."[3]

This he insisted upon even though defense counsel had made extensive investigations to prepare evidence in the mitigation phase.

The nature and circumstances of the offense, as previously stated, most certainly demonstrate the existence of aggravating circumstances and the near absence of R.C. 2929.04(B) mitigating factors. From our review of the proceedings below, we conclude that the trial court had before it substantial evidence from which it could determine that the deceased did not induce or facilitate his death, and that this is therefore not a mitigating factor. We have found no evidence in the record that the appellant was under duress or under coercion; nor is there any evidence that he was provoked into committing the offense. There was no evidence of any mental illness or incapacity. There was no evidence presented concerning appellant's prior criminal convictions. He was the principal offender. Although he was twenty-five years old at the time of the offense, this does not necessarily overbear the aggravating circumstances as enumerated by the jury. Therefore, appellant's sole mitigating evidence was the assertion by counsel that he had no prior calculation or design.

On the other hand, the jury had already determined the existence of three aggravating circumstances pursuant to R.C. 2929.04(A). They were that appellant was a prisoner in a detention facility, as set forth in R.C. 2929.04(A)(4); that the victim was a peace officer, that appellant knew this and that the victim was engaged in his duties as a peace officer at the time of the offense, as set forth in R.C. 2929.04(A)(6); and that the victim was a peace officer, that appellant knew this and that it was the appellant's specific purpose to kill a peace officer, as set forth in R.C. 2929.04(A)(6).

After weighing the above factors, we conclude, without doubt, that the aggravating circumstances outweighed that evidence offered in mitigation. Thus, the conviction and sentence are affirmed.

Accordingly, the judgment of the court of appeals is affirmed.

*Judgment affirmed.*

SWEENEY, LOCHER and DOUGLAS, JJ., concur.

MOYER, C.J., concurs in judgment only.

WRIGHT and H. BROWN, JJ., dissent.

---

[3] Appellant's waiver was read to the trial court but not placed before the jury.

In light of appellant's express and specific desire, trial counsel was fully muzzled.

WRIGHT, J., dissenting. I must respectfully dissent from the result reached by the majority. The most devastating thing the prosecution can assert about an alleged thief, drunk driver, sex offender or one charged with violence is prior conduct of a similar nature. My experience in presiding over a large number of criminal trials and discussing other such trials with my former colleagues on the trial bench confirms my belief in the extremely prejudicial nature of the "gratuitous" testimony by Wayne Lewis that appellant was a "crazy" man, and that "he is in here [jail] for murder, and he won't hesitate to do it again." The majority finds that the trial court's failure to grant the timely motion for a mistrial was "harmless error." Frankly, I cannot imagine anything more harmful or inflammatory in character than testimony of this nature, and I believe that the failure to grant a mistrial was reversible error.

Further, the *entire* focus of the defense was to negate the state's allegations that appellant committed the offense with prior calculation and design. The evidence clearly established that appellant purposely caused the death of Deputy Pence, but to make the death penalty recommendation, the jury had to find that evidence proved beyond a reasonable doubt that the killing was accomplished with prior calculation and design. To find prior calculation and design, the jury must consider appellant's apparent state of mind and mental processes. See R.C. 2903.01(A); *State v. Reed* (1981), 65 Ohio St. 2d 117, 19 O.O. 3d 311, 418 N.E. 2d 1359; *State v. Cotton* (1978), 56 Ohio St. 2d 8, 10 O.O. 3d 4, 381 N.E. 2d 190. Consequently, testimony about propensity and alleged prior offenses could more easily enter into jury deliberations on prior calculation and design than it could enter into deliberations about whether appellant committed a specific act. Thus, I simply cannot accept the notion that *any* judge could have instructed away the information of a prior offense of murder by appellant or his propensity to commit yet another homicide,[4] and reasonably anticipate that twelve citizens would be unaffected in their deliberations concerning the criminal element of "prior calculation and design."[5]

However, speculation about the effect of this testimony is not necessary in this cause. Its prejudicial nature was clearly demonstrated by the incident with juror Taylor. As set forth in the majority opinion, juror Taylor asked to be excused from the jury when she overheard a news broadcast in which the prior murder charge was mentioned. She explained, "I heard a version of what happened, why he was in there in the first place, that he had been there previous, and that upset me * * *." Upon questioning by the

---

[4] Defendant was in jail on a *charge* of murder as opposed to a conviction. However, the "gratuitous remark" by the witness clearly suggested that defendant had already been convicted of murder.

[5] A second incident involving the prior murder charge occurred during trial when juror Taylor informed the court that she wished to be excused from the jury because she had heard on the news that, at the time of the offense at issue, appellant was serving time for another murder charge. Rather than dismiss the juror immediately, the court permitted her to remain on the panel. This compounded the problem noted herein. Allowing a juror to remain after she has expressed her desire to be excused due to a clearly prejudicial news account that has come to her attention is erroneous, especially when her stated reservations are ignored.

court and counsel about whether the information would influence her so that she could not be impartial, she replied "* * * I am hoping not * * *," and professed her desire to be fair. However, her equivocal statement, "I am hoping not," indicates the profound effect this information had upon her. Given the reaction of juror Taylor, it makes little sense to conclude that similar information did not likewise infect the other eleven jurors.

"* * * [R]egardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies," every individual is entitled to a fair trial by an impartial jury. *Irvin* v. *Dowd* (1961), 366 U.S. 717, 722; *Groppi* v. *Wisconsin* (1971), 400 U.S. 505, 509. "The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin* v. *Dowd, supra,* at 722. See, also, *Groppi* v. *Wisconsin, supra,* at 509.

Generally, the introduction of evidence indicating that a defendant committed another crime similar in character, but wholly independent of the offense for which he is being tried, is prohibited.[6] *State* v. *Hector* (1969), 19 Ohio St. 2d 167, 48 O.O. 2d 199, 249 N.E. 2d 912, paragraph one of the syllabus; *State* v. *Curry* (1975), 43 Ohio St. 2d 66, 72 O.O. 2d 37, 330 N.E. 2d 720; *State* v. *Burson* (1974), 38 Ohio St. 2d 157, 67 O.O. 2d 174, 311 N.E. 2d 526. See, also, Evid. R.

404(B). The admission of such evidence is extremely prejudicial because "[t]he average individual is prone to much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime." *State* v. *Hector, supra,* at 174-175, 48 O.O. 2d at 204, 249 N.E. 2d at 916-917. Thus, we have held that the introduction of evidence of prior unrelated crimes is reversible error. *State* v. *Hector, supra*; *State* v. *Burson, supra*; *State* v. *Curry, supra*; *State* v. *Breedlove* (1971), 26 Ohio St. 2d 178, 183, 55 O.O. 2d 441, 443, 271 N.E. 2d 238, 241; *State* v. *Wilkinson* (1980), 64 Ohio St. 2d 308, 18 O.O. 3d 482, 415 N.E. 2d 261.

Instructions to the jury to disregard testimony of a prior offense are insufficient to overcome the prejudicial effect of such inadmissible evidence. " '* * * [T]oo often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collocation of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell.' " *Bruton* v. *United States* (1968), 391 U.S. 123, 129. In *State* v. *Breedlove, supra,* at 184, 55 O.O. 2d at 444, 271 N.E. 2d at 241-242, an identification using mugshot photographs with police identifi-

---

[6] Exceptions to this rule may be permitted "where the prior offense is part of a common plan or scheme or where it tends to prove motive, intent, knowledge or identity, not *because* the prior acts prove that defendant is crime prone, but *in spite of* such fact * * *. [Emphasis *sic*.]" *State* v. *Hector* (1969), 19 Ohio St. 2d 167, 48 O.O. 2d 199, 249 N.E. 2d 912, paragraph two of the syllabus; see, also, Ohio Evid. R. 404(B);

R.C. 2945.59 and *State* v. *Breedlove* (1971), 26 Ohio St. 2d 178, 183, 55 O.O. 2d 441, 443, 271 N.E. 2d 238, 241. These exceptions must be read narrowly and are strictly construed against the state. *State* v. *Burson* (1974), 38 Ohio St. 2d 157, 158, 67 O.O. 2d 174, 175, 311 N.E. 2d 526, 528; *State* v. *DeMarco* (1987), 31 Ohio St. 3d 191, 31 OBR 390, 509 N.E. 2d 1256.

cation numerals on them coupled with the direct testimony that suggested to the jury that the defendant had been arrested previously was reversible prejudicial error in spite of the trial court's instructions to disregard this evidence because "such limiting instruction was not sufficient to overcome the substantial risk that, despite such instruction, the jury would look to the police photographs in determining defendant's guilt of this offense." *Id.* at 183, 55 O.O. 2d at 444, 271 N.E. 2d at 241.

During this *very* term of court, this rule was asserted in a model of clarity in *State* v. *Allen* (1987), 29 Ohio St. 3d 53, 55, 29 OBR 436, 438, 506 N.E. 2d 199, 201, in which *all* members of this court agreed that: "The existence of a prior offense is such an inflammatory fact that ordinarily it should not be revealed to the jury unless specifically permitted under statute or rule. *The undeniable effect of such information is to incite the jury to convict based on past misconduct rather than restrict their attention to the offense at hand. For this reason, we do not consider the trial court's admonitions to the jury that appellee's prior convictions are immaterial to his guilt of the present charge sufficient to cure the error."* (Emphasis added.)

The senseless and brutal nature of the offense revealed in the case at bar does not alter appellant's right to a fair trial in which he is presumed innocent until proven guilty beyond a reasonable doubt. Earlier this term, in *State* v. *DeMarco* (1987), 31 Ohio St. 3d 191, 31 OBR 390, 509 N.E. 2d 1256, we reaffirmed that error is harmless when there is no reasonable possibility that it may have contributed to the accused's conviction. "* * * In order to hold the error harmless, the court must be able to declare a belief that the error was harmless beyond a reasonable doubt." *State* v. *Bayless* (1976), 48 Ohio St. 2d 73, 2 O.O. 3d 249, 357 N.E. 2d 1035, paragraph seven of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911. In the cause at issue there is a likelihood that evidence of the earlier murder charge may have affected the jury deliberations on the element of prior calculation and design. Thus, the trial court could not have properly found that the error in the admission of this evidence was harmless beyond a reasonable doubt.

In my view, the trial court erred in denying the motion for a mistrial. Appellant was denied fundamental due process of law and a fair trial by his peers and a second trial should be granted.

H. BROWN, J., concurs in the foregoing dissenting opinion.