[Cite as *State v. Young*, 2013-Ohio-618.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

DONALD E. YOUNG

      Defendant-Appellant

Appellate Case No.   24997

Trial Court Case No. 11-CR-166/1

(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

## O P I N I O N

Rendered on the 22nd day of February, 2013.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by R. LYNN NOTHSTINE, Atty. Reg. #0061560, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

RICHARD A.F. LIPOWICZ, Atty. Reg. #0018241, 130 W. Second Street, Suite 1900, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . .

WELBAUM, J.

    **{¶ 1}**    Defendant-Appellant, Donald Young, appeals from his conviction and sentence

on one count of burglary. Following a jury trial, Young was convicted and was sentenced to a five-year mandatory term of imprisonment.

{¶ 2} Young contends that the trial court committed various errors, including overruling Young's motion to suppress statements; granting the State's motion for a jury view; and admitting Young's clothing into evidence despite the State's failure to properly authenticate and identify the evidence. Young further maintains that his conviction is against the manifest weight of the evidence and that there is insufficient evidence for a burglary conviction because he did not trespass into an occupied structure or any portion thereof.

{¶ 3} We conclude that the trial court did not err in overruling the motion to suppress statements, because Young voluntarily, knowingly, and intelligently waived his rights. The trial court also did not abuse its discretion in granting the State's motion for a jury view. In addition, the trial court did not err in admitting Young' s clothing into evidence, because the State met its burden of establishing that it is reasonably certain that substitution, alteration or tampering with evidence did not occur. Finally, Young's conviction is not against the manifest weight of the evidence, and there is sufficient evidence to support a burglary conviction. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} Defendant-Appellant, Donald Young, was indicted in February 2011 on one count of burglary, arising from an incident that occurred at the home of Dayton Police Officer, Lt. Greg Gaby. On the day in question, Gaby's 13-year old son was ill and was home from school. Gaby came home during his lunch-hour to check on his son, ate lunch, and then returned to

downtown Dayton, where his office was located. When Gaby left, the garage door was either down to the ground or was open only approximately six to eight inches. The family had two cats who lived in the garage, and it was Gaby's wife's practice to leave the door slightly ajar so the cats could get out.

{¶ 5} As soon as Gaby arrived back at the office, he received a telephone call from his son, who said someone was trying to break into the house. The son testified at trial, and stated that he heard someone knocking at the door and also heard the family dog barking. Looking from the hallway that led into the dining room, the son saw two people through a window. One man was wearing a dark blue jacket and blue jeans, and the other was wearing tan coveralls. These people were identified, respectively, as Benjamin Buck and Donald Young.

{¶ 6} The son was able to see part of the face and the side of the body of the man in the tan coveralls. Because he did not know who the men were, he called his father. He was scared. As he was speaking to his father, he noticed that one of the men was trying the door knob. He also saw the man in the tan coveralls walk over and try the kitchen door, which was on the porch, off to the side. The person who tried the kitchen door was also wearing a knit cap. From where the son stood, in the hallway, the intruders could not see him.

{¶ 7} Gaby received a description of the individuals, including their clothing and race, and told his son to stay where he was, but to leave by a door or window if the intruders kicked in the door. Gaby called Officer Saluke, who was working that day, told him what was going on, and asked Saluke to go to the house and get other crews started. Gaby called his son back, and asked if the men had gotten in the house. His son said he did not know, but the dog was still at the back door, barking.

{¶ 8}    When Gaby arrived back at the house around 1:30 p.m., no cars were in the driveway, but the garage door was about half-way open.  Gaby first checked the basement and house to see if anyone was in the house.  He then went into the garage and noticed that a new power washer and an air compressor were gone.  A pile of tools was also sitting in the middle of the garage where the car would normally have been parked.  Gaby saw footprints outside leaving from the garage down the driveway, and some tracks from the power washer.  About an inch of snow was on the ground.

{¶ 9}    Around that time, Officer Saluke arrived, and Gaby told him to stay where he was, that no one was at the house, and that the intruders had taken a power washer and compressor.  Gaby had his police radio and put out a broadcast for the police to be looking for a vehicle in the area.  Gaby went back to the garage, having concluded that the men  would probably come back to get the tools in the garage.   While Gaby was in the garage,  his son began screaming and ran into the garage.   The son told Gaby that the men were in the back yard.  The son testified that he saw Young standing in the middle of the back yard and got a good look at his face.   He could not see the other man at that point, but believed he was somewhere near or on the patio.

{¶ 10}    Gaby was in uniform that day.  He ran around the side of the house to the back side, where the patio was located.  As Gaby was running, he heard someone yell, "Run!"  It was one of the two people on the other side of the house, but he could not tell which.  When Gaby came around the corner of the house, a man in blue jeans and a dark jacket was standing in the patio area.  Young, in tan coveralls, was about halfway between the patio and the tree line at the back of the property.  Young had already started running and Buck was following.

{¶ 11}    Gaby identified himself as a police officer and yelled at the men to stop, but they kept running.    Gaby gave chase, and also yelled over the police radio that the men were running toward an Ohio Department of Transportation (ODOT) facility that bordered Gaby's property. Gaby and the men went down a ravine, through the woods, and onto the ODOT property.    Gaby saw the men running toward a silver car that was parked at the ODOT entrance.

{¶ 12}    By that time, Saluke had arrived in his cruiser at the ODOT facility.    As Saluke passed the end of the ODOT driveway, he saw a gray car sitting at the far end of the driveway, facing the street.[1]    When Saluke was about halfway up the driveway, he saw a man wearing tan Carhartts (coveralls) and a knit hat run across his field of view.    Off to the left, Saluke saw a second subject, and then saw Lt. Gaby farther behind.    The man in the coveralls started around Saluke's car, looked at Saluke, looked back in the direction from which he had run, and then walked back and stood in front of Saluke's car.    Based on the description and transmissions he had received, Saluke immediately ordered the man in the coveralls to get on the ground and take his hands out of his pockets.    Buck was also apprehended.    While at the scene, Saluke saw footprints around the gray car and was able to see the handle of the pressure washer in the rear seat.

{¶ 13}    Saluke patted Young down and found a screwdriver in his pocket.    Officer Timothy Polley also arrived on the scene as Saluke was handcuffing Young.    Polley obtained Young's name and Social Security number, and transported Young downtown to the detective section, which is on the second floor of the Safety Building.    Detective Rick Oakley then conducted an interview with Young at about 2:20 p.m.    During the same time frame, Detective

---

[1] The car was described as gray and as silver, but the witnesses were referring to the same vehicle.

Davidson was interviewing Buck. At the time, Young had not changed his clothes and was still wearing the tan coveralls.

{¶ 14} After giving Young *Miranda* warnings and obtaining his written acknowledgment of the warnings, Oakley asked Young what had happened. Young said he was in the area, that he had just walked around, and that he had nothing to do with the burglary. Oakley told Young that he had two witnesses who said otherwise, that they had chased him from the scene, and that officers had caught Young. Oakley told Young that he would give him a few minutes to think about it, and got up to leave the room. At that point, Young asked what he was being charged with, and Oakley said "burglary." Young then said, "How can it be a burglary when we were only in the garage?" Oakley explained that the garage was attached to the house and that a homeowner was there.

{¶ 15} After Oakley came back to the room, Young said he had caught a ride with Buck, who was a friend from Springfield. Young said they were coming to the area to "hang out," or to head to the bread store located nearby. Young said he was "there," but never went into the garage. In addition, Young said that when they went back towards the house, it was because Buck wanted to look through the rest of the tools that were in the garage. Young denied being on Gaby's property at the time of the chase, and denied having anything to do with the crime.

{¶ 16} The interview was not video or audio-recorded, and Oakley did not have written notes of the interview, other than the pre-interview form that Young signed. Oakley did make a written report of the interview several days later.

{¶ 17} While the suspects were being interviewed, evidence crews took photographs of

the scene, including various footprints at the house and at the ODOT facility. The police did not take extensive footprint evidence, because many prints in the backyard and on ODOT property were not of good enough quality. Some prints were starting to melt and some had been trampled. Moreover, the evidence technician did not think footprint evidence was necessary because the suspects were apprehended leaving the property and trying to get back to a car full of stolen property. The technician was also unaware of the type of shoes worn by the suspects.

{¶ 18} The tread on the brand and style of shoes worn by Young was matched to a foot print found on the ODOT property, near the tree line. It did not match the other five photographs reviewed by the State's expert.

{¶ 19} The police towed the gray car to the processing garage, where it was photographed, inventoried, and dusted for fingerprints. Young's fingerprints were matched with prints found on a cigarette pack in the center console of the car.

{¶ 20} After presenting the above evidence, the State rested. Young did not call any witnesses. The jury then found Young guilty as charged, and he was sentenced accordingly. Young appeals from his conviction and sentence.

## II. Did the Trial Court Err in Overruling the Motion to Suppress?

{¶ 21} Young's first assignment of error contends that the trial court erred in overruling his motion to suppress statements. According to Young, his purported waiver of rights was not the product of free choice because Detective Oakley subjected him to coercion and deception. Young also claims he was unaware of the rights that he waived.

{¶ 22} Before the trial court ruled on the suppression motion, it held an evidentiary

hearing at which both Detective Oakley and Young testified. The court then overruled the motion, concluding that Young's testimony was not credible because Young testified that he was under the influence of drugs and emotional, and remembered only "bits and pieces" of what had occurred. Transcript of Suppression Hearing, p. 41. The trial court said it would have difficulty making findings of fact based on the recollection of a witness who said that the experience was "pretty much a blur." *Id.* The trial court also concluded that Young's claimed lack of understanding of the charge was not credible, because it was obvious from the circumstances of the arrest that it was in connection with a burglary or attempted burglary.

{¶ 23} The standards for reviewing decisions on motions to suppress are well established. In ruling on motions to suppress, the trial court "assumes the role of the trier of fact, and, as such, is in the best position to resolve questions of fact and evaluate the credibility of the witnesses." *State v. Retherford*, 93 Ohio App.3d 586, 592, 639 N.E.2d 498 (2d Dist.1994), citing *State v. Clay*, 34 Ohio St.2d 250, 298 N.E.2d 137 (1972). Accordingly, when we review suppression decisions, "we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard." *Id.*

{¶ 24} The United States Supreme Court has recognized that "custodial interrogations, by their very nature, generate 'compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.' " *Moran v. Burbine,* 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), quoting *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). "To combat this inherent

compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused. In particular, prior to the initiation of questioning, they must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present ... if [he] so desires.' " *Id.*, quoting *Miranda* at 468–470.

{¶ 25} A defendant may waive *Miranda* rights, but the waiver must be made " 'voluntarily, knowingly and intelligently.' " *Id.* at 421, quoting *Miranda* at 444. The United States Supreme Court has indicated that this inquiry has two separate dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Id.,* citing *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979).

{¶ 26} "In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v.*

*Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus, vacated as to death penalty, *Edwards v. Ohio,* 438 U.S. 911, 98 S.Ct. 3147, 57 L.Ed.2d 1155 (1978).

{¶ 27}    After reviewing the record of the suppression hearing, we find no error in the trial court's decision.   At the time of the interrogation, Young was 28 years old, could read, had a high school diploma, and was on parole for a prior burglary conviction.   Buck, the other suspected burglar, was Young's co-defendant on his last burglary case.    In addition, Young testified that he was familiar with the process of having his rights read to him.   Young stated that "Usually I just sign them and done [sic] talking."   Transcript of April 11, 2011 Suppression Hearing, p. 34.

{¶ 28}    Young's interrogation lasted only about 30 minutes, and Young never asked for a restroom break, a drink of water, or anything else.   Young was not handcuffed, was clothed, and according to Detective Oakley, did not appear distraught.   Oakley also did not notice any signs indicating that Young was under the influence of drugs, nor did Young indicate that he did not want to speak with police.   Furthermore, Young testified, as the trial court noted, that   the events were "pretty much a blur," and that he only remembered bits and pieces.   *Id.* at pp. 23 and 30.

{¶ 29}    Under the circumstances, the trial court did not err in disbelieving Young's claim that he did not understand the pre-interview form or the word "coercion," nor did the court err in finding Detective Oakley's testimony more credible.   Accordingly, the first assignment of error is overruled.

III.   Did the Trial Court Err in Granting the State's Motion for a Jury View?

**{¶ 30}** Young's second assignment of error states that "[t]he trial court erred in granting the State's motion for a jury view." Under this assignment of error, Young contends that the trial court abused its discretion in allowing a jury view because the view occurred in October, when there was no snow on the ground. Young also argues that the police took 87 pictures of the crime scene, which were sufficient, together with MapQuest exhibits and diagrams, to present the issues to the jury.

**{¶ 31}** A trial court has broad discretion in deciding whether to permit jury views, and its decision "will not be disturbed absent an abuse of discretion." *State v. Zuern*, 32 Ohio St.3d 56, 58, 512 N.E.2d 585 (1987). An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citation omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 32}** We see no abuse of discretion by the trial court. The snow itself was not relevant to the circumstances of the alleged crime, and a view of the premises could have been helpful to the jury. Furthermore, the cases Young cites involve denial of jury views where the jury had access to photographs, videos, and other exhibits. *See, e.g.*, *State v. Waugh*, 10th Dist. Franklin No. 07AP-619, 2008-Ohio-2289, ¶ 14. If a court does not abuse its discretion by denying a view where there are other methods to portray a scene, that does not, by necessity, mean that a jury view must be denied if these other methods exist. The court acted within its discretion when it allowed the jury to view the crime scene.

**{¶ 33}** Based on the above discussion, Young's second assignment of error is overruled.

IV. Did the Trial Court Err in Admitting Young's Clothing into Evidence?

{¶ 34} Young's third assignment of error states that "[t]he trial court erred in admitting Young's clothing into evidence despite the State's failure to properly authenticate and identify such evidence." Under this assignment of error, Young contends that there was a substantial break in the chain of custody, and that the trial court should not have allowed the admission of clothing (State's Exhibit 26), that Young allegedly wore on the day of the crime.

{¶ 35} In *State v. Hooper*, 2d Dist. Montgomery No. 22883, 2010-Ohio-4041, ¶ 35, we noted that:

The State has the burden of establishing the chain of custody of a specific piece of evidence, but the State's burden is not absolute; "[t]he state need only establish that it is reasonably certain that substitution, alteration or tampering did not occur." *State v. Barzacchini* (1994), 96 Ohio App.3d 440, 457–458, 645 N.E.2d 137; *State v. Blevins* (1987), 36 Ohio App.3d 147, 150, 521 N.E.2d 1105. While authentication of evidence is a condition precedent to its admission, the condition is satisfied when the evidence is "sufficient to support a finding that the matter in question is what its proponent claims." Evid.R. 901(A); *State v. Hunter*, 169 Ohio App.3d 65, 861 N.E.2d 898, 2006–Ohio 5113, at ¶ 16. Evidence of a process or system to produce an accurate result is sufficient to satisfy the rule. Evid.R. 901(B)(9). Breaks in the chain of custody go to the weight afforded the evidence, not its admissibility. *Blevins*, 36 Ohio App.3d at 150, 521 N.E.2d 1105; *State v. Qualls* (June 6, 1997), Clark App. No. 96–CA–68.

{¶ 36} The significant items in State's Exhibit 26 included tan coveralls, a knit hat, a

pair of Nike tennis shoes, and a screwdriver. Officer Timothy Polley transported Young to the jail after the interview with Detective Oakley was concluded. Jail staff collected these items from Young in Polley's presence, and Polley took the items directly to Detective Oakley, who placed his initials on the items. Polley did not place his initials on the items in compliance with normal police procedure, but he recalled and specifically identified all the items in Exhibit 26, other than two gloves that were ultimately excluded from evidence. Polley also stated that the items were in substantially the same condition as the last time he had seen them. The crime victims, Greg Gaby and his son, identified the coveralls and knit cap, and the remaining items were identified by other officers who interacted with Young on the day of the crime. Under the circumstances, the State established that " 'it is reasonably certain that substitution, alteration or tampering did not occur.' " *Hooper* at ¶ 35.

**{¶ 37}** Young's third assignment of error is overruled.

V. Is the Jury's Verdict Against the Manifest Weight of the Evidence?

**{¶ 38}** In the fourth assignment of error, Young contends that his conviction for burglary is against the manifest weight of the evidence. Young's argument in this regard is based on the following points. First, Young argues that the evidence and questions posed by the jury raise doubts about Detective Oakley's credibility. Second, Young maintains that his own exculpatory statements are consistent with the physical evidence, which failed to show that his footprints were in the fresh snow in front of the garage or in the backyard,

**{¶ 39}** "When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable

inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Eicholtz*, 2d Dist. Clark No. 2012-CA-7, 2013-Ohio-302, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541 (1997). "A judgment should be reversed as being against the manifest weight of the evidence 'only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 40} Our review of the evidence indicates that the jury did not clearly lose its way and create a manifest miscarriage of justice. After the case was submitted to the jury, the trial court received three questions from the jury. The first question concerned police protocol for interviewing witnesses, i.e., whether video or audio records were kept; what the permissible length of time is between interviewing and writing reports; and how long the police are required to keep notes after writing reports. The trial court concluded that these items had not been discussed at trial, and responded by telling the jury that it could not answer the question.

{¶ 41} Young contends that this question, in addition to a detail that Oakley recalled at trial and had not put in his report, indicates that the jury did not find Detective Oakley credible. Oakley's testimony overall was significant, because it included Young's admission that he had been in the garage. The detail that Oakley recalled at trial was insignificant, and related only to Young's statement that he and Buck had been in the area that day to visit a bread store located nearby. This fact had no bearing on the crime and was irrelevant to the case.

{¶ 42} Young's argument about the jury's assessment of Oakley's credibility is mere

speculation. By rendering a verdict in favor of the State, the jury apparently believed Oakley's testimony, and concluded that Young had participated in the burglary. The evidence and inferences to be drawn from the evidence support the jury's conclusion, and do not indicate that this is the exceptional case in which the evidence weighs heavily against the conviction.

{¶ 43} The second question that the jury submitted relates to a photograph (State's Exhibit C-11) showing shoe treads that the State's expert said had "similarities" to the tread of Young's shoes. The jury indicated in the question that it wished to verify the location of Exhibit C-11 in relationship to State's Exhibit C-3, which was a general view of the driveway. In response, the trial court told the jury that it must rely on its recollection of the evidence in the record.

{¶ 44} The footprint evidence was of limited assistance in the investigation, primarily because the police did not take very many photos of footprints at the scene. Officer Michael McDonald explained that many shoe prints were not of good enough quality to use for comparison because they had been trampled or were starting to melt. McDonald also did not believe that he would need to submit foot markings to the crime lab, because the defendants had been apprehended leaving the property and trying to get back to a car full of stolen property. Of the limited number of photographs (six) that the State's expert analyzed, three did not include any of the shoe impressions that she was asked to compare, and only one fit Young's shoes. This latter impression was from a photo taken on the ODOT property, not the victims' property.

{¶ 45} Thus, the footprint comparisons were inconclusive with regard to Young. The State's expert, however, also referred to Defendant's Exhibit C-11, which was not used as a comparison because it had been taken from far away and had no scale. The expert did say that

the treads in the photo had similarities to the treads of both sets of shoes that were submitted for comparison. The jury could well have been interested in this photograph, but the question does not indicate that the jury was confused; rather, it indicates that the jury took its duties seriously by wanting to verify locations.

{¶ 46}    According to the testimony, Exhibit C-11 was taken directly in front of the Gabys' garage. If the jury correctly recalled the evidence, as the court instructed, the jury could have concluded that a footprint with tread similar to that of Young's shoes was found directly in front of the garage – which would support the conviction. Thus, there is no basis for finding that the jury clearly lost its way and created a manifest miscarriage of justice when it convicted Young.

{¶ 47}    The final question from the jury involved whether the family room porch would be considered an "other structure or portion thereof." Trial Transcript, Vol. III, p. 440. In response, the trial court told the jury that this is a determination the jury must make. *Id.* at 141.

{¶ 48}    According to Young, this question indicates that the jury did not believe Detective Oakley's testimony, and did not believe that Young's footprints were in the snow in front of the house or in the backyard. Young maintains that the jury "stretched" the definition of occupied structure to include the roof overhanging the porch in front of the family room, where the son saw Young trying to enter the house.

{¶ 49}    In response, the State argues that the jury's question does not mean that the jury necessarily determined that the porch was part of the structure, nor does it mean that the jury rejected evidence indicating that Young went into the garage. We agree with the State.

{¶ 50}    The jury was presented with eye-witness testimony indicating that Young was

on the front porch of the Gaby residence, and tried the door handle on the kitchen door. This immediately followed an attempt to gain entrance into the house by the family room door. In both situations, Young and Buck were on the porch. The jury also received evidence indicating that the garage had been entered and that Young questioned Detective Oakley about how he could be charged with burglary when they had only gone into the garage. The jury may have simply been sorting out the evidence when it asked the question. However, the jury's decision to ask the question does not indicate that the jury clearly lost its way or that this is the exceptional circumstance in which the evidence weighs heavily against conviction. The evidence the State presented, if believed, is more than adequate to support the jury verdict.

{¶ 51}     Accordingly, the fourth assignment of error is overruled.

VI.    Was the Conviction Based on Insufficient Evidence?

{¶ 52}     Young's fifth assignment of error states that "[t]here was insufficient evidence to convict Young of burglary because Young did not trespass in an occupied structure or any portion thereof." Under this assignment of error, Young contends, based on the jury's third question about the porch, that the front porch was not an "occupied structure," and that the evidence is insufficient to sustain the conviction for burglary.

{¶ 53}     "In reviewing a claim of insufficient evidence, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

**{¶ 54}** Young was convicted of having violated R.C. 2911.12(A)(1), which states as follows:

(A) No person, by force, stealth, or deception, shall do any of the following:

(1) Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense; * * *.

**{¶ 55}** We have previously concluded that an attached garage is a " 'separately secured' portion of an occupied structure," for purposes of an aggravated burglary conviction. *State v. Wells*, 2d Dist. Greene No. 92-CA-122, 1994 WL 12461, * 2 (Jan. 19, 1994). *See, also, e.g.*, *State v. Plachko*, 8th Dist. Cuyahoga No. 91358, 2009-Ohio-1687, ¶ 12 (holding that "[a]n attached garage is a separately secured or separately occupied portion of an occupied structure for purposes of the burglary statute.") In contrast, a porch that is not enclosed would not be a separately secured or separately occupied portion of an occupied structure.

**{¶ 56}** Young's argument depends on a false premise – that the jury found that he did not enter the garage and that he only trespassed on the porch. The evidence, when viewed most favorably to the State, indicates that Young trespassed in the Gabys' attached garage, when a person other than Young was present, with purpose to commit theft. Accordingly, " 'any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 70.

**{¶ 57}** Young's fifth assignment of error is overruled.

### VII.

**{¶ 58}** All of Young's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN and HALL, JJ., concur.

Copies mailed to:

R. Lynn Nothstine
Richard A.F. Lipowicz
Hon. Dennis J. Langer