OPINION
{¶ 1} Defendant-appellant, Scott Waugh, appeals from a judgment of the Franklin County Municipal Court convicting him of operating a vehicle while impaired, a violation of former R.C. 4511.19(A)(1)(a).[1] For the reasons that follow, we affirm the trial court's judgment. *Page 2 
 {¶ 2} According to the state's evidence, on December 11, 2006, shortly before 10 p.m., defendant drove a vehicle that collided with another vehicle on Murnan Road, in Franklin County. After the collision, a deputy sheriff who responded to the scene detected an odor of alcohol about defendant's person. A passenger in the car that was struck by the car that defendant drove reported that she saw a "guy" in the driver's seat of the other vehicle prior to the collision. Other motorists traveling on the same road, who moments after the collision came upon the car that defendant had been driving, described finding either a male, or defendant, in the driver's seat of the car, and a female in the front passenger seat. Following the collision, defendant admitted that he was driving one of the cars involved in the crash but, after learning that he would receive a citation, defendant recanted this admission.
 {¶ 3} After the collision, defendant refused to submit to a chemical test or tests under R.C. 4511.191, thereby subjecting his driver's license to administrative suspension. By complaint, defendant was charged with operating a vehicle while impaired ("OVI"), a violation of former R.C. 4511.19(A)(1)(a); refusal to submit to chemical testing, a violation of former R.C. 4511.19(A)(2); and failure to drive within marked lanes, a violation of R.C. 4511.33.[2] Defendant pled not guilty to these charges and demanded a jury trial.
 {¶ 4} By means of a pre-trial motion, defendant moved the trial court for a "jury view" to allow jurors to observe (1) the scene of the accident, and (2) the automobile that defendant allegedly drove at the time of the collision. The trial court denied defendant's motion. *Page 3 
 {¶ 5} Before voir dire, the state orally moved to dismiss charges related to (1) defendant's refusal to submit to chemical testing as required by former R.C. 4511.19(A)(2), and (2) defendant's failure to drive within marked lanes as required by R.C. 4511.33. The trial court granted the state's oral motion to dismiss these charges.
 {¶ 6} A jury trial was later held to determine whether beyond a reasonable doubt defendant operated a vehicle while impaired in violation of former R.C. 4511.19(A)(1)(a), as charged in the complaint. At trial, defendant contended that, at the time of the collision, he was not driving one of the vehicles involved in the collision and therefore reasoned that he could not be guilty of operating a vehicle while impaired, as the state alleged.
 {¶ 7} After the state presented its evidence, defendant moved for acquittal pursuant to Crim. R. 29. The trial court denied defendant's Crim. R. 29 motion. Defendant then presented evidence in his defense. After submitting his evidence, defendant again moved for acquittal pursuant to Crim. R. 29. The trial court denied defendant's renewed request for acquittal. No rebuttal evidence was offered by the state.
 {¶ 8} After deliberating, the jury found defendant guilty of OVI, as charged. The trial court thereafter convicted defendant of operating a vehicle while impaired, imposed a sentence, and dismissed the remaining charges against defendant that were alleged in the complaint.
 {¶ 9} From the trial court's judgment, defendant now appeals. Defendant advances two assignments of error for our consideration:
 Assignment of Error No. 1:
 The trial court erred to the prejudice of Appellant by denying Defendant's request for a jury view of the crime scene and of *Page 4 
the vehicle Defendant was accused of driving pursuant to R.C. 2945.16, in violation of the Due Process Clause of the Fourteenth Amendment to the Ohio [sic] Constitution and comparable provisions of the Ohio Constitution.
 Assignment of Error No. 2:
 The Trial Court violated Appellant's right to Due Process as Guaranteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution by entering verdicts of Guilty, as the jury's verdict was against the manifest weight of the evidence.
 {¶ 10} Defendant's first assignment of error asserts that, by summarily denying his request for a jury view pursuant to R.C. 2945.16, the trial court violated defendant's right to due process of law under the United States and Ohio Constitutions.
 {¶ 11} R.C. 2945.16 provides in part:
 When it is proper for the jurors to have a view of the place at which a material fact occurred, the trial court may order them to be conducted in a body, under the charge of the sheriff or other officer, to such place, which shall be shown to them by a person designated by the court. While the jurors are absent on such view no person other than such officer and such person so appointed, shall speak to them on any subject connected with the trial. The accused has the right to attend such view by the jury, but may waive this right.
 {¶ 12} "The question of a `jury view' is within the discretion of the trial court and a decision regarding such will not be disturbed on appeal unless an abuse of discretion is established." State v.Montalvo (1974), 47 Ohio App.2d 296, 297; see, also, Calloway v.Maxwell (1965), 2 Ohio St.2d 128, citing R.C. 2945.16; and 23 C.J.S. 989 Criminal Law § 986 (stating that "[t]he determination as to whether the jury should view the premises where the crime occurred lies within the sound discretion of the trial court"); State v. Drummond,111 Ohio St.3d 14, 2006-Ohio-5084, at ¶ 62, motion to reopen denied (2007),111 Ohio St.3d 1463, 2007-Ohio-1722. *Page 5 
 {¶ 13} "`"The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."'" State v. Smith, Franklin App. No. 03AP-1157, 2004-Ohio-4786, at ¶ 10, quoting Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, quoting State v. Adams (1980),62 Ohio St.2d 151, 157. An unreasonable decision is one that is unsupported by a sound reasoning process. AAAA Enterprises, Inc. v.River Place Community Urban Redevelopment Corp. (1990),50 Ohio St.3d 157, 161; see, also, Dayton ex rel. Scandrick v. McGee (1981),67 Ohio St.2d 356, 359, citing Black's Law Dictionary (5 Ed.) (observing that "`[unreasonable' means `irrational'"); State v. Congrove, Franklin App. No. 06AP-1129, 2007-Ohio-3323, at ¶ 9. An arbitrary attitude, on the other hand, is an attitude that is "`without adequate determining principle * * * not governed by any fixed rules or standard.'"Scandrick, at 359, quoting Black's Law Dictionary (5 Ed.); see, also,Congrove, at ¶ 9. "Unconscionable" may be defined as "affronting the sense of justice, decency, or reasonableness." Black's Law Dictionary (8 Ed. 2004) 1561. When applying an abuse-of-discretion standard, "an appellate court is not free to substitute its judgment for that of the trial judge." Berk v. Matthews (1990), 53 Ohio St.3d 161, 169; see, also, Stockdale v. Baba, 153 Ohio App.3d 712, 2003-Ohio-4366, at ¶ 54, citing Berk, supra.
 {¶ 14} Here, denying defendant's request for a jury view, the trial court found that the issues that defendant wanted to present could be "presented to the jury by way of video, by way of pictures, other means than a jury view." (Tr. May 22, 2007, at 7; see, also, Tr. Vol. I, at 12.) Such a determination by the trial court is supported by a sound reasoning process and is not without an adequate determining principle. Moreover, we *Page 6 
cannot conclude that the trial court's denial of defendant's request for a jury view affronts a sense of justice, decency, or reasonableness. Accordingly, we conclude that the trial court did not act unreasonably, arbitrarily, or unconscionably by denying defendant's request for a "jury view" pursuant to R.C. 2945.16.
 {¶ 15} Defendant maintains, however, that the trial court's denial of his request for a jury view deprived him of a fair trial and prejudiced his ability to present an exculpatory defense, thereby depriving him of due process of law under the United States and Ohio Constitutions. We disagree.
 {¶ 16} "The Fourteenth Amendment to the United States Constitution prohibits any state from depriving `any person of life, liberty, or property, without due process of law.'" State ex rel. Haylett v. OhioBur. of Workers' Comp. (1999), 87 Ohio St.3d 325, 331. See, generally, Section 1, Fourteenth Amendment to the United States Constitution. Under the Ohio Constitution, "Section 16, Article I * * * states that `every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law." Haylett, at 331. See, generally, Section 16, Article I, Ohio Constitution.
 {¶ 17} "The `due course of law' provision [in Section 16, Article I of the Ohio Constitution] is the equivalent of the `due process of law' provision in the Fourteenth Amendment to the United States Constitution." Sorrell v. Thevenir (1994), 69 Ohio St.3d 415, 422-423, citing Direct Plumbing Supply Co. v. Dayton (1941), 138 Ohio St. 540,544; see, also, Arbino v. Johnson Johnson, 116 Ohio St.3d 468,2007-Ohio-6948, at ¶ 48. "When read in conjunction with Sections 1, 2 and 19 [of the Ohio Constitution], Section 16 is the equivalent to theFourteenth Amendment's due process clause. * * * As a consequence, decisions of the United States Supreme Court can be utilized to give *Page 7 
meaning to the guarantees of Article I of the Ohio Constitution."State ex rel. Heller v. Miller (1980), 61 Ohio St.2d 6, 8. (Citations omitted.)
 {¶ 18} "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi (1973), 410 U.S. 284, 294,93 S.Ct. 1038. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Id. at 302. InChambers, the Supreme Court of the United States explained:
 * * * The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. Mr. Justice Black * * * identified these rights as among the minimum essentials of a fair trial:
 "A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense-a right to his day in court-are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel."
Id. at 294, quoting In re Oliver (1948), 333 U.S. 257, 273,68 S.Ct. 499.
 {¶ 19} Although due process requires that an accused be given a fair opportunity to defend against the state's accusations, due process does not provide an accused with a limitless right to present relevant evidence. See, e.g., United States v. Scheffer (1998), 523 U.S. 303,308, 118 S.Ct. 1261 (stating that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. * * * A defendant's interest in presenting such evidence may thus `bow to accommodate other legitimate interests in a criminal trial process'"). (Citations omitted); id. (observing that the United States Supreme Court has found "the exclusion of evidence to be *Page 8 
unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused"). (Citations omitted.)
 {¶ 20} In Montana v. Egelhoff (1996), 518 U.S. 37, 116 S.Ct. 2013, the Supreme Court of the United States instructed:
 * * * Due process demands that a criminal defendant be afforded a fair opportunity to defend against the State's accusations. Meaningful adversarial testing of the State's case requires that the defendant not be prevented from raising an effective defense, which must include the right to present relevant, probative evidence. To be sure, the right to present evidence is not limitless; for example, it does not permit the defendant to introduce any and all evidence he believes might work in his favor * * * nor does it generally invalidate the operation of testimonial privileges * * * Nevertheless, "an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence" that is essential to the accused's defense. * * *
Id. at 63-64. (Citations omitted.)
 {¶ 21} A view of the crime scene, however, "is not considered evidence, nor is it a crucial step in the criminal proceedings."State v. Hopfer (1996), 112 Ohio App.3d 521, 542, appeal not allowed,77 Ohio St.3d 1488, reconsideration denied (1997), 77 Ohio St.3d 1550, citing State v. Rtchey (1992), 64 Ohio St.3d 353, 367, abrogated on other grounds by State v. McGuire (1997), 80 Ohio St.3d 390, certiorari denied (1998), 525 U.S. 831, 119 S.Ct. 95; see, also, State v.Smith (1993), 90 Ohio App.3d 177, 180; State v. Burgin (Mar. 23, 2001), Ross App. No. 99CA2532, citing Hopfer, supra, citing Ritchey, supra;State v. Didion, 173 Ohio App.3d 130, 2007-Ohio-4494, at ¶ 9. Rather, "[a] jury *Page 9 
view of a crime scene is for the purpose of helping the jurors to better understand the evidence presented." Burgin, supra. See 1 Ohio Jury Instructions, Section 2.50.[3]
 {¶ 22} Because a jury view is not evidence, Hopfer, at 542, by denying defendant's request for a jury view, the trial court therefore did not prevent defendant from presenting relevant, probative evidence to support his defense. See, e.g., Hasan v. Ishee (Aug. 14, 2006), S.D.Ohio No. 1:03-cv-288 (finding that a trial court's denial of a petitioner's request for a jury view did not prevent a petitioner from presenting evidence to support his defense).
 {¶ 23} Additionally, in the instant case, notwithstanding the trial court's denial of defendant's motion for a jury view, defendant was presented with the "minimum essentials" of a fair trial: reasonable notice of the charges against him; opportunity to be heard in his defense, i.e., "a right to his day in court"; opportunity to examine the witnesses against him; opportunity to offer testimony; and opportunity to be represented by counsel. See Chambers, at 294. Specifically, in the instant case, defendant had an opportunity to cross-examine witnesses whom the state called on its behalf in support of its allegation that defendant operated a vehicle while impaired. Moreover, defendant had an opportunity to offer evidence in his defense, including the testimony of an expert witness, who opined that defendant was not the driver of one of the vehicles involved in the collision.
 {¶ 24} Under such facts and circumstances, despite defendant's claims to the contrary, we must conclude that defendant was afforded a meaningful adversarial testing *Page 10 
of the state's claim that defendant operated a vehicle while impaired, in violation of former R.C. 4511.19(A)(1)(a), as charged in the complaint.
 {¶ 25} Furthermore, because, as discussed above, the trial court did not act unreasonably, arbitrarily, or unconscionably by denying defendant's request for a jury view, defendant cannot make a showing of identifiable prejudice to support reversal attributable to a due process violation. See, e.g., In re C. W., Medina App. No. 06CA0033-M,2006-Ohio-5635, at ¶ 9 (stating that "[t]o demonstrate a reversible denial of due process, as with any alleged error on appeal, an appellant typically must make a showing of identifiable prejudice"); see, also,Estes v. Texas (1965), 381 U.S. 532, 542-543, 85 S.Ct. 1628, rehearing denied, 382 U.S. 875, 86 S.Ct. 18 (acknowledging that in most cases involving claims of due process violations a showing of identifiable prejudice to the accused is required).
 {¶ 26} Accordingly, for the reasons set forth above, we hold that the trial court's denial of defendant's request for a jury view did not deprive defendant of due process of law under the United States and Ohio Constitutions. We therefore overrule defendant's first assignment of error.
 {¶ 27} Defendant's second assignment of error asserts that the trial court's judgment is against the manifest weight of the evidence.
 {¶ 28} When presented with a manifest-weight claim in a criminal matter, an appellate court engages in a limited weighing of the evidence to determine whether the factfinder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997), 78 Ohio St.3d 380,387, reconsideration denied, 79 Ohio St.3d 1451; State v. Conley *Page 11 
(Dec. 16, 1993), Franklin App. No. 93AP-387; State v. Group,98 Ohio St.3d 248, 2002-Ohio-7247, at ¶ 77. "[Sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief." State v.Wilson, 113 Ohio St.3d 382, 2007-Ohio-2202, at ¶ 25, citingThompkins, at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?"Wilson, at ¶ 25. "`When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony.'"Wilson, at ¶ 25, quoting Thompkins, at 387, citing Tibbs v. Florida
(1982), 457 U.S. 31, 42, 102 S.Ct. 2211.
 {¶ 29} "The question for the reviewing court [in a manifest-weight claim] is `whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" Group, at ¶ 77, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. See, also, Thompkins, at 387; id. at paragraph four of the syllabus (construing and applying Section 3[B][3], Article IV, Ohio Constitution) (holding that "[t]o reverse a judgment of the trial court on the weight of the evidence, when the judgment results from a trial by jury, a unanimous concurrence of all three judges on the court of appeals panel reviewing the case is required").
 {¶ 30} Although when reviewing a manifest-weight claim an appellate court engages in a limited weighing of the evidence, Thompkins, at 387;Conley, supra; Group, *Page 12 
at ¶ 77, "[d]eterminations of credibility and weight of the testimony remain within the province of the trier of fact." State v. Walters, Franklin App. No. 06AP-693, 2007-Ohio-5554, at ¶ 94, appeal not allowed (2008), 117 Ohio St.3d 1425, 2008-Ohio-969, citing State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus. "The jury thus may take note of the inconsistencies and resolve them accordingly, `believ[ing] all, part or none of a witness's testimony.'"Walters, at ¶ 94, quoting State v. Raver, Franklin App. No. 02AP-604, 2003-Ohio-958, at ¶ 21, citing State v. Antill (1964), 176 Ohio St. 61,67. See, also, State v. Harris, Franklin App. No. 02AP-977, 2003-Ohio-2414, at ¶ 18.
 {¶ 31} Division (A)(1) of former R.C. 4511.19 provided: "No person shall operate any vehicle, streetcar, or trackless trolley within this state, if, at the time of the operation, any of the following apply: (a) The person is under the influence of alcohol, a drug of abuse, or a combination of them." See, also, former R.C. 4511.01(A) (definition of "vehicle").[4] According to former R.C. 4511.19(G)(1), "[w]hoever violates any provision of divisions (A)(1)(a) to (i) or (A)(2) of this section is guilty of operating a vehicle under the influence of alcohol, a drug of abuse, or a combination of them."
 {¶ 32} Here, to prove beyond a reasonable doubt that defendant operated a vehicle while impaired, the state called the following witnesses to testify on its behalf: (1) Deputy James Plumb of the Franklin County Sheriff's Office, who responded to the collision scene; (2) Amber Haley, a passenger in the car that was struck by defendant; (3) Gregory Bare, a person who was traveling on the road at the time of the collision; and (4) Christa Peters, another person who was traveling on the road at the time of the collision. *Page 13 
The state did not offer any tangible evidence in addition to the presented testimonial evidence.
 {¶ 33} Deputy Plumb testified that when he arrived at the scene of collision shortly before 10 p.m. on December 11, 2006, defendant and another person were receiving treatment from emergency medical personnel in the back of an EMS vehicle. (Tr. Vol. I, at 169.) Deputy Plumb testified that, after arriving at the accident scene, he attempted to determine whether defendant was driving one of the vehicles. Id. at 170. According to Deputy Plumb, while defendant was in the EMS vehicle, he queried defendant about who had been driving the car. Id. Deputy Plumb testified that defendant responded to his question as follows: "I believe he said, I was." Id. Deputy Plumb also heard defendant inform EMS personnel that he had been driving the car. Id. at 179. Deputy Plumb further testified that when he informed defendant that he was giving him a citation, defendant "recanted and said that he was not driving." Id.
 {¶ 34} At one point, Deputy Plumb requested defendant to exit the EMS vehicle so that he could further talk with him. Id. at 170. According to Deputy Plumb, defendant "was giving me some frustration. He didn't want to leave the medic. He didn't want to leave the female that was in the medic." Id. at 171. Defendant, however, ultimately exited the EMS vehicle as requested. According to Deputy Plumb, upon arriving at the cruiser, defendant did not want to be seated within the marked unit. Id. According to Deputy Plumb, during his interaction with defendant, he observed the following: "[Defendant] was unsteady on his feet. I believe I actually had to put my arm on his arm and escort him back to the cruiser. He had bloodshot eyes, a strong presence of alcoholic beverage, the odor, and — along with his injuries, I mean, he had, you, a wrapped hand and wrapped *Page 14 
head and some blood on him[.]" Id. at 172. When asked to characterize how strong or weak the odor of alcohol was about defendant's person, Deputy Plumb testified: "The area that we were at was a pretty open area. It's a cornfield — or fields on either side, and I could smell him pretty strongly between being inside the medic as well as outside." Id. at 172-173. According to Deputy Plumb, he questioned defendant about his alcohol consumption. Id. Deputy Plumb testified that defendant replied that he had had "a lot [of drinks] * * * but that was earlier." Id. According to Deputy Plumb, defendant did not state a specific amount of alcohol that he consumed. Id.
 {¶ 35} When asked whether defendant appeared to understand Deputy Plumb's directions, requests, or statements, Deputy Plumb testified that "[h]e seemed to understand everything. He was argumentative so he comprehended enough to argue with me about things." Id. at 213.
 {¶ 36} Deputy Plumb also testified that he requested defendant to perform field sobriety tests, but defendant refused. Id. at 181. Defendant also later declined to provide blood for chemical testing. Id. at 184.
 {¶ 37} Amber Haley testified that on December 11, 2006, she and her daughter, who was two years old at the time, spent most of the day with a friend, Sarah Richardson. According to Ms. Haley, after arriving at Ms. Richardson's house at approximately 11:30 a.m., she drank "three or four" mixed drinks during the course of her visit, and "[i]t was like around six was my last drink[.]" (Tr. Vol. II, at 222-223; 224.) Because she had been drinking and because she did not want to drive home with her daughter in the car, Ms. Haley contacted her husband and asked him to drive her and their daughter home. Id. at 225. According to Ms. Haley, at approximately 9:45 p.m., on December 11, 2006, her *Page 15 
husband began to drive the family toward home. Gregory Bare, who was driving Ms. Haley's husband's car, followed the Haleys' car, and Mr. Bare was followed by Christa Peters, a friend of Ms. Haley. Id. at 219-226.
 {¶ 38} Ms. Haley testified that after the collision she went by the vehicle that had struck her car when she began to run back to Ms. Richardson's house for help. Id. at 233. When asked whether she had any contact with defendant that evening, Ms. Haley testified:
 I only — I just remember when they hit us and my eyes were open, I remember seeing a guy in the car driving like when he came at us. I remember keeping my eyes open, and I saw a guy hit us. And when we got out of the car, I saw Greg at the car, at the driver door, and he was talking. And he was like-I heard him say, "Let me help you out. Let me help you." And I remember seeing a guy's arm.
Id.
 {¶ 39} Ms. Haley further testified that a "guy's arm" was "[i]n the driver's door. * * * Outside the car, hanging out like this." Id. Ms. Haley testified that she did not have any kind of face-to-face communication with defendant following the collision. Id. Ms. Haley also testified that she did not see anyone else in the car with defendant. Id. at 234.
 {¶ 40} Gregory Bare testified that he was at Ms. Richardson's house on the evening of December 11, 2006. During his visit to Ms. Richardson's home, Mr. Bare did not consume any alcoholic beverages. Id. at 254. Mr. Bare testified that when he left Ms. Richardson's house, he drove Mr. Haley's car and followed the Haleys' car. According to Mr. Bare, Christa Peters followed behind the car that Mr. Bare was driving. Id. at 253-255. According to Mr. Bare, he drove Mr. Haley's car "so I could pick [Mr. Haley] up after he dropped [Mr. Haley's wife] off with her car and bring him back [to Ms. Richardson's *Page 16 
house]." Id. at 255. According to Mr. Bare, following the collision, he stopped in the middle of the road, ran to the Haleys' car to make sure that everyone in the car was "okay," and he "ran over to the other car, because nobody had come out." Id. at 257-258. Mr. Bare testified that he approached the driver's side of the other car and observed:
 A body in the passenger side, leaning over, and I couldn't reach in, but I couldn't get the door open. And Christa [Peters] had to come over, and I'm screaming, trying to get them because they were unconscious at the time. And at that time somebody else came up and knocked him back over into the driver's seat, and it was a woman that came up.
Id. at 258.
 {¶ 41} According to Mr. Bare, approximately one minute elapsed between the collision and the moment he approached the other car. Id. at 258-259. Mr. Bare testified that, when he came upon defendant, he could not see defendant's face. Mr. Bare did, however, observe that defendant's upper body was leaning towards the passenger side of the vehicle. Id. at 260. When asked about the positioning of defendant's lower body, Mr. Bare testified that "[it] was more on the driver's side. It was a little bit of everywhere, a little on the driver's side, to the left." Id. According to Mr. Bare, after he assisted with opening a door, defendant and a female, who "[came] up" on the passenger side of the vehicle, crawled out of the car. Id. at 260-261. On cross-examination, however, Mr. Bare later clarified that he did not actually witness defendant and his female companion climbing out of the car. Id. at 270. According to Mr. Bare, defendant did not respond to him after Mr. Bare inquired if defendant was "okay." Id. at 261.
 {¶ 42} Christa Peters, Ms. Richardson's sister, testified that on December 11, 2006, she visited her sister from about 11 a.m. until about 9:30 p.m. or 9:45 p.m., approximately the same time period that Ms. Haley and her daughter were at Ms. *Page 17 
Richardson's house. Id. at 281-283. According to Ms. Peters, while she visited with her sister, she drank one alcoholic drink at exactly 2 p.m. "* * * because that's when the pizza came. * * * I had some mixed thing that had cranberry. I didn't even finish it. I didn't like it." Id. at 284.
 {¶ 43} Ms. Peters testified that she left her sister's house at the same time that Ms. Haley and her husband left the Richardson house. Id. at 283. Ms. Peters left the house "because I was going to pick up Greg [Bare] because he was driving Sam's car * * * ." Id. Ms. Peters testified: "There were three cars leaving: Amber's car, which Sam was driving; then Greg was driving Sam's car, he was following them so she would not have their cars at their house; and I was following Greg, and I was going to take him back. * * * I was the third car." Id.
 {¶ 44} According to Ms. Peters, after the collision occurred, she checked on the occupants of the Haleys' car and then she "[ran] to the other car, along with Greg, and we go to check on the people in the other car." Id. at 286-287. Ms. Peters testified that approximately 30 to 40 seconds elapsed from the time the collision occurred and when she went to defendant's vehicle. Id. at 287.
 {¶ 45} Ms. Peters testified that she first approached the driver's side of defendant's vehicle. Id. When asked what she saw when she went to the driver's side of defendant's vehicle, Ms. Peters testified: "Driver's side, saw Mr. Waugh. His legs were in the driver's — like, by the pedals, and he was kind of laying over the console almost into the passenger side, but his legs and everything were where the pedals are." Id. According to Ms. Peters, upon approaching defendant's vehicle, she did not see another person in defendant's vehicle, but later she discovered that another person was in the vehicle. Id. *Page 18 
at 287-288. Ms. Peters testified: "We were yelling at them, `Get up, get up.' It was smoking. We thought maybe it was going to catch on fire. All of a sudden, a woman sat up and kind of pushed [defendant] back into the driver's seat, and she sat up and was in the passenger seat. * * * She was — he was laying over her, and her head was basically where the pedals are. We couldn't see her because he was laying over her. * * * When she sat up, it moved him into his spot, and she sat up into the passenger seat." Id. at 288. When questioned whether she recognized defendant in the courtroom, Ms. Peters testified: "Honestly, it was dark. I can't recognize everyone. I think it's Mr. Waugh here, but I'm not sure. * * * Honestly, it's so vague. I mean, December, it was dark." Id. at 292.
 {¶ 46} After the state presented its evidence, and after the trial court denied defendant's Crim. R. 29 motion, defendant presented evidence on his behalf. Besides calling himself as a witness, defendant called these witnesses to testify: (1) Sandra Knisley, (2) Timothy Knisley, (3) Michelle Crawford, and (4) Jack Holland.
 {¶ 47} Defendant testified that on December 11, 2006, at approximately 7 p.m., while driving his girlfriend, Michelle Crawford's car, he picked up Ms. Crawford from work and drove to the mechanic shop of Tim Knisley. (Tr. Vol. III, 428-429.) According to defendant, he previously brought his truck to Mr. Knisley for repairs due to an electrical wiring harness problem. Id. at 429. While defendant was at Mr. Knisley's shop, he had three beers while he discussed the repair of his truck. Id. at 430. According to defendant, while he was at Mr. Knisley's shop, Mr. and Mrs. Knisley also drank beer, but defendant's girlfriend, Ms. Crawford, did not. Id. At some point, Mr. Knisley invited defendant and Ms. Crawford to a nearby bar to "finish our conversation and have a beer or two." Id. at 431. *Page 19 
 {¶ 48} Defendant testified that Ms. Crawford drove to the bar, while he sat in the passenger seat. Id. Defendant testified that on the evening of December 11, 2006, he had been wearing a "Minnesota boot" due to an ulcer on the bottom of his foot. Id. at 432-433. According to defendant, he did not drive to the bar because "I had a * * * big old brace on my leg. And it's a little tiny car, a big console in the middle. And it's just a real pain in the butt to get to the driver's seat." Id. at 432.
 {¶ 49} According to defendant, while he was at the bar, he "[d]rank a few more beers," id. at 433, and he "wrapped up talking about the truck." Id. On cross-examination, defendant, however, admitted that, during the approximately 45 minutes to one hour period of time that he was at the bar, he drank three beers. Id. at 470.
 {¶ 50} Defendant testified that, upon leaving the bar, he and Ms. Crawford left before Mr. Knisley because Mr. Knisley "got kind of waylaid by somebody asking him about their vehicle[.]" Id. at 433. Defendant testified that Ms. Crawford climbed into the driver's seat, and he sat in the passenger seat. Id. at 434. Defendant testified:
 Well, of course, always Michelle gets in, climbs in, gets in the driver seat. I remember I'd left my phone in the car. I had several messages, and it was going nuts. And I'm kind of looking at my phone. We've already pulled out at that point in time. I'm kind of keying through my phone and heard Michelle say, "What's that?"
 * * *
 Like I said, I'm going through my phone, and I hear Michelle say, "What is that?" I kind of look up and just it was an odd sight. Four cars coming. They were really close together and they were off at the — an angle so they were coming at us like about a 30-degree angle. I can see why it caught her attention. They were running so close it looked like a halo of lights. You could tell there was more than one car, but only see the headlights of the first car. And it was just a — kind of a glow. And she said something — or "Do you think they're *Page 20 
racing?" I said yeah. And about that time, I mean, just a split second later, the car runs off the side of the road.
Id. at 434-435.
 {¶ 51} Defendant also testified that, prior to the collision, "[o]ut of instinct, I grab [sic] the wheel to jerk us over to the other field, and I didn't even make it to the steering wheel." Id. at 436; 438. Defendant further testified that the "[n]ext thing I remember is being in the ambulance with Michelle unconscious stretched out on the gurney, all kinds of paramedics working on her. It was a terrifying experience." Id. at 438.
 {¶ 52} Defendant testified that he did not recall if anyone in the ambulance asked him if he was the driver of the vehicle. Id. at 439. When asked if he recalled making any statements that he had been driving the car, defendant testified:
 I think I remember at one point in time, and I don't even think it was an officer, but I could be wrong too, I think it was one of the paramedics, just in conversation while they were bandaging me up said, "Who was driving?" And I just assumed they needed it for — to figure — I don't know why, but anyway — and I just remember pointing at her when they asked the question.
Id. at 439-440.
 {¶ 53} On cross-examination, defendant testified that he did not have any recollection whatsoever that he told a law enforcement representative that he had been driving. Id. at 471.
 {¶ 54} Defendant also testified that he remembered that "at some point in time being walked towards a police car. I remember falling down in the process." Id. at 440. When asked what happened after he was walked towards a police car, defendant testified: *Page 21 
 Everything kind of goes blank. And I remember waking up in the back, somebody [in the back seat of the police cruiser] shaking me on the shoulder in the back of the cruiser. And I wake up, and he's asking me if I'm all right, and I'm still really foggy. And he's talking. He starts saying, "I'm so sorry. I'm so sorry I hit you."
Id. at 440-441.
 {¶ 55} Defendant further testified that, after realizing that he had been placed in the backseat of the cruiser with the person whom defendant believed caused the collision, defendant went "ballistic" and "start[ed] beating on the window of the cruiser" because he could not believe that he had been put in the backseat of the cruiser with the person whom he believed caused the accident. Id. at 450.
 {¶ 56} According to defendant, while he was hospitalized, police officers arrested him for "DUI" and presented him with a "ticket," even though defendant maintained that he had not been driving Ms. Crawford's car at the time of the collision. Id. at 453-454. Defendant also testified that, after he was charged with OVI, he began to question whether his belief that he had not been driving the car was accurate. Id. at 456. Later, after speaking with the Knisleys, however, defendant ultimately became convinced that he had been the passenger in the vehicle, not the driver. Id. at 462; 466.
 {¶ 57} According to defendant, on the morning following the accident, after sensing that "[something don't feel right" and thinking that "I'm going to get screwed[,]" defendant "grabbed [a] camera, jumped in [his] mom's car, [and] went to take pictures of the accident scene." Id. at 455.
 {¶ 58} Sandra Knisley testified that she was acquainted with defendant because defendant and his female companion had come to her auto repair shop in approximately December 2006 to have defendant's truck repaired. (Tr. Vol. II, 297-298.) Ms. Knisley *Page 22 
testified that, while her husband and defendant were attempting to diagnose the problem with defendant's truck, she, her husband, and defendant drank beer. Id. at 298-299. Ms. Knisley testified: "We had two apiece. I don't know if everybody finished the second one, but Michelle, the girl that was with him, did not have anything to drink. The others, Scott, my husband, and myself had two." Id.
 {¶ 59} According to Ms. Knisley, at approximately 8 p.m., on the evening of the accident, she, her husband, defendant, and defendant's female companion met a nearby bar. Defendant and his companion drove separately and were followed by Ms. Knisley and her husband. Id. at 299. Ms. Knisley testified that they remained at the bar for approximately forty-five minutes to an hour. Id. Ms. Knisley testified:
 When I walked out, I walked out the door just ahead of my husband. He was talking to someone at the bar. I went on out. I went out, and Scott — when I went out the back door, Scott and Michelle's car was facing where I was walking out, it was back out onto the road. It's dark out there. There isn't any lights. The window was up. I couldn't see. I waved, but nobody waved back. And so I went ahead and got in my car and sat down.
 And right when I sat down in my car, my husband came out the door. And right when he walked out the door, we heard a crash. I got back out of the car, and both of us ran to the crash.
Id. at 300.
 {¶ 60} Ms. Knisley further testified: "There was a vehicle sideways in the road and Scott's vehicle was — was in the corn field off the road, and it was — all the smoke and stuff was still going up in the air. And we ran over to the car to make sure that they were still alive." Id. at 301. According to Ms. Knisley, the collision occurred north of a curve in the road. Id. *Page 23 
 {¶ 61} Ms. Knisley testified that she and her husband ran to the passenger side of defendant's vehicle "because we knew the driver's door on her car did not work." Id. at 302. When asked what she saw through the passenger side of the car, Ms. Knisley testified: "Scott's head was up against the [passenger side] window. He was passed out. Michelle's head was in the driver's seat. Her rear end was up against the dash, and her knees were on the floor." Id. at 302-303. See, also, id. at 309; 319.
 {¶ 62} According to Ms. Knisley, a woman claiming to be a paramedic attempted to open a door and "kept yelling at Michelle, trying to get her to wake up." Id. at 303. Ms. Knisley testified: "She kept yelling, and we kept standing there looking at Scott and her inside the car. Finally Michelle said her name, and when she said `Michelle,' his head came up, he came, too, right when she said Michelle. And when his head come up, and that's when my husband opened up the car door and got him out of the car. And then he's holding onto him, helping him stand up. And I got Michelle out of the car." Id.
 {¶ 63} After emergency personnel arrived, Ms. Knisley and her husband left the scene, walked back to the bar, and washed themselves in a bathroom because "[w]e had blood all over us." Id. at 304. Before they left the collision scene, Ms. Knisley and her husband spoke briefly with one paramedic who inquired whether they were in the vehicle. Id. at 304-305. After answering in the negative, Ms. Knisley and her husband continued walking "[b]ecause I had been drinking and my husband had been drinking, and we didn't want to stay there and talk to all the policemen. And we had to get — we got in our vehicle and went home, and we decided we just better leave." Id. at 305.
 {¶ 64} On cross-examination, when questioned about how many beers defendant drank on the evening of the collision, Ms. Knisley testified that within a two-hour period of *Page 24 
time, defendant had drunk four beers, two with Ms. Knisley and her husband at their shop, and two beers at the bar. Id. at 313-314. Also, on cross-examination, Ms. Knisley testified that, prior to trial, she and defendant had had discussions wherein defendant indicated that he did not know whether he was driving. Id. at 323. Based on the positioning of the bodies in defendant's car when she came upon defendant after the collision, Ms. Knisley surmised that defendant had not been the driver of one of the vehicles involved in the collision. Id.
 {¶ 65} Timothy Knisley, a mechanic, testified that defendant stopped by his repair shop on December 11, 2006, at approximately 7 p.m., to check whether Mr. Knisley had been able to diagnose the problem with the electrical system in his truck. Id. at 327. According to Mr. Knisley, defendant stayed at the shop for approximately one hour, and afterward he and his wife met defendant and his girlfriend, Ms. Craword, at a nearby bar. Id. Mr. Knisley testified that he, his wife, defendant, and defendant's girlfriend remained at the bar for approximately another hour. Id. at 328. According to Mr. Knisley, defendant and his girlfriend left the bar about a minute before he did. Id. Mr. Knisley testified that when he walked outside from the back door of the bar, he heard a crash. After hearing the crash, he and his wife ran toward the direction of the crash and arrived at the crash scene within approximately 50 seconds. Id. at 328; 330. According to Mr. Knisley, as he and his wife approached defendant's car, he saw a lady who stated she was an off-duty paramedic who was screaming at Michelle. Id. at 329. Mr. Knisley also saw another person standing by the driver's door, "which the driver's door of the vehicle didn't work" because "that was something me and Scott had talked about at one time, and he said he thought he could fix." Id. Mr. Knisley testified: *Page 25 
 So at that time my wife and I, we just went around to the passenger side of the car. And that's when Michelle and Scott — I mean, they got — was just — they was unconscious. Scott's head was laying against the passenger side window; setting in the passenger seat, with his head against the window and his body pushing against the door. And Michelle, her head was kind of like, — she was, like, upside down, with her head underneath the steering wheel and the seat.
Id.
 {¶ 66} Mr. Knisley also testified: "Inside their vehicle, basically, Scott was, like I said, setting [sic] in the passenger seat. He was leaning against the door. He was unconscious. And Michelle was kind of laying, like, on the floorboard, kind of like she'd been flipped or something." Id. at 330.
 {¶ 67} Because Mr. Knisley was fearful that defendant would fall out of the car if he opened the passenger door, Mr. Knisley delayed in opening the door until he saw defendant begin to stir. Id.
 {¶ 68} According to Mr. Knisley, after assisting defendant and Michelle from the vehicle, he and his wife "stood them up upside the vehicle, and tried to talk to them, hold them up to keep them from falling, because neither one of them could keep standing up, `til the paramedic got there." Id. at 331. After the paramedics arrived approximately five minutes later, Mr. Knisley and his wife "kind of put Scott to Michelle and told him to kind of hold her up. We went ahead and start leaving." Id. Mr. Knisley testified that he left without talking to police officers or paramedics because "[t]he way it looked like to us, I would say Scott and Michelle wouldn't have been in the wrong. We didn't see no reason to." Id.
 {¶ 69} On cross-examination, Mr. Knisley confirmed that, prior to going to the bar, everyone in their party, except Ms. Crawford, had two drinks at Mr. Knisley's garage. Id. *Page 26 
at 333. According to Mr. Knisley, at the bar everyone in their party had "roughly" two beers apiece. Id. at 334.
 {¶ 70} On re-direct examination, Mr. Knisley also testified that defendant wore a brace on his left leg "that went around his whole foot and ankle all the way up to his knee, where he couldn't bend his foot and ankle." Id. at 349. Mr. Knisley further testified: "Basically [defendant] couldn't move around too well on his left foot. Their car, with door handle not working on the driver's side, you could not get in or out of it, so, therefore, you had to go through the passenger side. And the car had a console in it, which made it rough for him to get in or out of the vehicle because of the console and his left leg being wrapped up in this plastic thing where he couldn't bend his foot and ankle." Id. at 350-351.
 {¶ 71} Michelle Crawford, defendant's girlfriend, testified that, on the day of the collision, defendant, who was driving her car, a 1994 Cutlass Supreme convertible, picked her up from work at the end of the work day. Id. at 367; 391. Ms. Crawford testified that defendant was driving her car because "[h]is car was broke down[.]" Id. at 367. According to Ms. Crawford, her driver's side door was broken, id. at 368, and, even though defendant was able to drive her car, defendant was inconvenienced by driving her car "`cause he — he's taller than me, and he's got a boot, so it's harder for him to climb over the hump of the car than it is for me." Id. at 368-369.
 {¶ 72} Ms. Crawford testified that after defendant picked her up from work, they went to a mechanic's shop to inquire about repairs to defendant's truck. Id. at 369. According to Ms. Crawford, while they were at the mechanic's shop, Mr. Knisley, Mrs. Knisley, and defendant drank some beer. Ms. Crawford, however, did not drink anything *Page 27 
at the repair shop. Id. at 370-371. According to Ms. Crawford, while defendant was at the mechanic's shop, he drank "two or three" beers. Id. at 371.
 {¶ 73} According to Ms. Crawford, at some point, the Knisleys invited defendant and her to join them at a nearby bar. Ms. Crawford testified that she did not really want to go "because I was on a diet, and I was really hungry and I wanted to go home and eat some chicken." Id. Nevertheless, Ms. Crawford testified that she drove to the bar with defendant where they remained for "[a]round an hour, a little over an hour." Id. at 371-372.
 {¶ 74} According to Ms. Crawford, while she was at the bar, she "had a beer and a half" while everyone else "had, like, two or three" beers. Id. at 372. Ms. Crawford testified that, while the Knisleys gathered their belongings, she and defendant walked out of the bar and "[she] got in the driver's side" of the car. Id. Ms. Crawford testified: "I got into the passenger side. Then I put my foot over the hump, the console, put my butt on there, got onto the driver's side and kicked my other — my right leg over to the driver's side." Id. at 373. According to Ms. Crawford, she and defendant did not have any discussion about who would drive the car. Id. Ms. Crawford also did not wear a seat belt. Id. at 395.
 {¶ 75} Ms. Crawford testified that, after starting the car, she turned left onto Murnan Road. Id. at 374. Ms. Crawford also testified: "I said something to Scott. I said, `Look how funny them headlights look.' The next thing I said, `Look how fast they're coming.'" Id. According to Ms. Crawford, she did not remember anything further until she awoke in an ambulance. Id. And, according to Ms. Crawford, the next thing that she *Page 28 
remembered was being in the emergency room where she was treated for multiple injuries, including a cut to the side of her head. Id. at 374-376.
 {¶ 76} At trial, Ms. Crawford identified photographs that depicted some of her red hair from inside the car, which, according to Ms. Crawford, had not been there prior to the accident. Id. at 377; 381-382.
 {¶ 77} On cross-examination, the state inquired about Ms. Crawford's failure to contact law enforcement authorities to inform them that she, not defendant, had been driving her car at the time of the accident. Id. at 403. In response to this questioning, Ms. Crawford testified that she spoke with an attorney about this issue, and she was advised that law enforcement authorities would contact her about the crash. Id. at 403-404. Ms. Crawford further testified that law enforcement authorities failed to contact her, id. at 404, and, because she was subpoenaed to testify, "[she] figured that would be my time to tell in court what happened, that I was driving." Id. at 406. On re-direct examination, Ms. Crawford testified that, although she received subpoenas from the prosecutor, she was never interviewed by the prosecutor prior to trial. Id. at 412-414.
 {¶ 78} Jack Holland, a traffic accident reconstructionist and a witness called on defendant's behalf, testified that he was contacted to determine, if possible, who was the driver and passenger of Ms. Crawford's car on the night of the collision.[5] (Tr. Vol. III, at 504.) Mr. Holland testified that he was told that both people in Ms. Crawford's vehicle were unrestrained, i.e., were not wearing seat belts, at the time of the collision. Id. at 514. *Page 29 
 {¶ 79} Mr. Holland testified that occupant-kinematics is a science used to explore the secondary collision between the occupants of a vehicle and the interior of a vehicle in a collision. Id. at 504-505. Mr. Holland testified that his investigation found evidence of a radial head strike of the windshield of Ms. Crawford's car, which resulted in spiderwebbing from the point of impact, and curly red hair, which was embedded in the windshield of Ms. Crawford's car in front of the driver's seat. Id. at 517-519. Mr. Holland's investigation also found red hair on top of a sun visor, and on the hinge of the convertible top above the upper left part of the driver's side area. Id. at 520-521.
 {¶ 80} Mr. Holland testified:
 * * * Given the impact with [the Haleys' car], the obstruction of the bag, and, of course, the obstruction on the steering wheel, which is quite rigid, the occupant went forward, slightly right, struck the visor and the windshield almost simultaneously. The crash occurs in a tenth of a second. They like to say a hundred mile a second, but that comes out to one-tenth of a second for us. And it almost have [sic] to be simultaneous, bang, bang.
 * * *
 [The hair back over on the driver's side left above the head] would almost have to be recoil, and we did have a secondary collision — not collision, but a forceful stop when it rolled to a rest in the ditch. Remember, we had one tire pinched and the car still slowing. So with the car, it would have to wiggle to the right, with the left side going up, going down into the ditch. That's the most likely place where that hair was deposited on the hinge.
Id. at 522-523.
 {¶ 81} Mr. Holland also testified that the driver's seat was "forward of the passenger seat," thereby suggesting that the driver was the shorter of the two occupants in the vehicle. Id. at 523. *Page 30 
 {¶ 82} After defense counsel reviewed Mr. Holland's findings concerning the positioning of the driver's seat, damage to the windshield, and the presence of hair samples, when asked whether he was able to conclude whether somebody with long curly red hair was the driver, Mr. Holland testified: "In my mind that would exclude anybody but the driver with long curly hair." Id. at 524-525.
 {¶ 83} As to the passenger in Ms. Crawford's vehicle at the time of the collision, Mr. Holland testified:
 * * * The passenger is going to respond to the same forces that the driver does, with one exception. There's a low console here. And it is not going to interfere with the movement of the passenger from right to left. Again, as a result of the impact with [the Haleys' car], the front of the car is going to go this way, the occupants are going this way because the vehicle's being slowed by at least 22 feet every second. Therefore, this right front seat passenger is going to be directed to the left and forward and will hit anything that's in his or her path.
Id. at 525.
 {¶ 84} When asked about items that may have been in the passenger's way, Mr. Holland testified: "The most obvious is the rearview mirror. And, of course, the windshield, if it progresses that far. And if the movement from right to left is great enough, then I've had passengers impact the right side of the steering wheel." Id.
 {¶ 85} Mr. Holland further testified that his observations revealed that the passenger side of the steering wheel in Ms. Crawford's car was "significantly deformed." Id. at 526. When asked about his "thought on how that steering wheel got bent," id., Mr. Holland testified: "Very forceful impact from the right to the left side by a significant force or weight, if you want to call it that. In this case, I would say that it was an impact with the — from the right front seat passenger." Id. at 526-527. *Page 31 
 {¶ 86} When asked about the kind of injuries that he would ordinarily expect to see concerning an occupant in the passenger seat after hitting the steering wheel, Mr. Holland furher testified: "I would expect the humerus to be broke [sic], the shoulder maybe to be fractured, or most common injury is broken ribs." Id. at 527.
 {¶ 87} Based on his review of Ms. Crawford's car's rearview mirror and its bent steering wheel, Mr. Holland drew a conclusion that, at the time of the collision, defendant was the right front seat passenger. Id. at 530. When asked whether Ms. Crawford could have been in the passenger seat and left hair samples on the other side, id. at 530-531, Mr. Holland testified: "No. No. Not — she would not have been able to get there with sufficient force to do that. If she had been directed upward, it would not be consistent with the injuries she received. And, of course, the injuries that Mr. Waugh received would have to be reversed." Id. at 531. Mr. Holland further testified that his opinion about who were the driver and passenger in Ms. Crawford's car at the time of the collision would not have changed "because [he] came in late on this thing." Id. at 535.
 {¶ 88} On cross-examination, Mr. Holland testified that, although his accident reconstruction was a "realistic" one, he acknowledged that "[i]deally, I would have been out there the next day so I could check for tire marks." Id. at 538. Mr. Holland also admitted that he was unable to investigate the accident shortly after it occurred, id. at 538-539, and his conclusions, which were based on theories of physics and kinematics, were dependent upon the facts that were submitted for analysis. Id. at 539.
 {¶ 89} On cross-examination, the assistant city prosecutor also asked Mr. Holland:
 Q. If — For the sake of argument, if Mr. Waugh was in the passenger side of this vehicle and had an orthopedic device on his left foot, given your calculations, would there be any way within the realm and physics and kinetics [sic] for his *Page 32 
body to wind up with the lower portion of his torso on the driver's side with his feet down by the driver pedals?
 A. Given the dynamics that I worked out, no.
Id. at 554-555.
 {¶ 90} Relying on the testimony of his expert witness, defendant claims the jury's verdict is against the manifest weight of the evidence because injuries to defendant and Ms. Crawford can only be explained if Ms. Crawford, not defendant, was the driver of one of the vehicles involved in the collision. Moreover, defendant further asserts that his expert witness's testimony about the positioning of the driver's seat in Ms. Crawford's car also is explainable only if Ms. Crawford, not defendant, was the driver of her car at the time of the collision.
 {¶ 91} In reviewing defendant's claim that his conviction is against the manifest weight of the evidence, we are mindful that "[determinations of credibility and weight of the testimony remain within the province of the trier of fact." Walters, at ¶ 94, citingDeHass, at paragraph one of the syllabus; see, also, Harris, supra, at ¶ 18. In McKay Mach. Co. v. Rodman (1967), 11 Ohio St.2d 77, the Supreme Court of Ohio stated:
 * * * [I]n the last analysis, the jury or the court, if a jury is waived, is the sole weigher of credibility and testimony. The jury can accept all, a part or none of the testimony offered by a witness whether it is expert opinion or eyewitness fact, whether it is merely evidential or tends to prove the ultimate fact. In other words, `(t)he jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest. (In so doing it) * * * should consider the demeanor of the witness and the manner in which he testifies, his connection or relationship with the * * * (plaintiff) or the defendant, and his interest, if any, in the outcome.' State v. Antill, 176 Ohio St. 61, 67, 197 N.E.2d 548. Thus the function of the expert who gives opinion testimony in order to aid the jury in reaching a just determination is entirely *Page 33 
separate from the function of the jury which must assess credibility and settle controverted issues of fact.
Id. at 82. (Footnote omitted.)
 {¶ 92} In Croft v. State Farm Auto Ins. Co. (Jan. 8, 2002), Allen App. No. 1-01-72, the Third District Court of Appeals also explained:
 It is well established that the jury, as the trier of fact, is vested with the power to judge the credibility of witnesses and to determine the weight to be afforded to the evidence presented. "A jury is free to accept or reject any or all of the testimony of any witness, including testimony of an expert witness." The opinion of an expert is not conclusive upon the jury and is but an item of evidence intended to assist the trier of fact in consideration with the other evidence of the case. Moreover, even where expert testimony is not directly controverted by the opposing party's evidence, the jury is not required to accept the testimony so long as the record contains objectively discernible reasons upon which the jury could rely to reject the expert's opinion testimony. * * *
Id. (Citations and footnotes omitted.)
 {¶ 93} Here, the testimony of the state's witnesses, and reasonable inferences drawn from these witnesses' testimony, if believed by the jury, as the trier of fact, support the state's allegation that defendant operated a vehicle while impaired on December 11, 2006. In the instant case, at the accident scene, defendant made admissions that he was the driver of one of the vehicles, which he later recanted. A deputy sheriff who responded to the collision scene detected an odor of alcohol about defendant's person when he escorted defendant to his cruiser. Amber Haley, who was a passenger in the car that defendant's car struck, testified that she saw a "guy" driving the other car and a "guy's arm" by the door on the driver's side. Christa Peters, who came upon the accident shortly after it occurred, testified that she saw a man's legs by the pedals in the car that defendant was accused of having driven. Gregory Bare, who also came upon the *Page 34 
accident shortly after it occurred, testified that defendant's lower body was more toward the driver's side of the vehicle.
 {¶ 94} Although the testimony of defendant's expert witness raises doubts about the state's evidence, defendant's expert witness's opinion that defendant was not driving Ms. Crawford's car at the time of the collision is not conclusive upon the jury, and it is but an item of evidence for the jury's consideration. In the instant case, the state's witnesses' observations, which identified defendant or a male as the driver of Ms. Crawford's car, were made moments after the collision. The temporal proximity of these observations to the collision, including an observation that defendant's feet were by the driver pedals (Tr. Vol. II, at 287), as well as the state's evidence that defendant initially admitted to driving the car before recanting this admission, provide an objectively discernible reason upon which the jury could rely to reject the expert's opinion testimony which was based upon occupant-kinematics. See, also, Tr. Vol. III, at 554-555 (wherein defendant's expert witness conceded that, given the dynamics that he found, there would not be any way within the realm of physics and occupant-kinematics for the lower portion of defendant's torso to wind up with his feet by the driver pedals).
 {¶ 95} After independently reviewing the evidence, and bearing in mind the jury's superior, first-hand perspective in judging the demeanor and credibility of witnesses, see, e.g., Harris, supra, at ¶ 18, we cannot conclude that the jury "lost its way" by finding that the state's evidence was more persuasive, or that this is "`* * * the exceptional case in which the evidence weighs heavily against conviction.'"Group, at ¶ 77, quoting Martin, at 175. Stated differently, we cannot conclude that, after determining the credibility and weight of the testimony, including the testimony of defendant's expert witness, and taking *Page 35 
note of inconsistencies, the jury erred by finding that beyond a reasonable doubt defendant violated former R.C. 4511.19(A)(1)(a), as charged in the complaint. We therefore hold that the trial court's judgment is not against the manifest weight of the evidence and overrule defendant's second assignment of error.
 {¶ 96} Accordingly, having overruled both of defendant's assignments of error, we affirm the judgment of the Franklin County Municipal Court.
Judgment affirmed.
BRYANT and BROWN, JJ., concur.
[1] Shortly after defendant was involved in an automobile collision from which charges against defendant arose, the Ohio General Assembly passed (2006) Am. Sub. H.B. No. 461, which, among other things, amended R.C. 4511.19. (2006) Am. Sub. H.B. No. 461 was later approved on January 2, 2007, and became effective on April 4, 2007. Division (A)(1)(a) of R.C. 4511.19 was unaffected by the amendments of (2006) Am. Sub. H.B. No. 461.
[2] The driver of the other vehicle, Sam Haley, also was cited for operating a vehicle while impaired and was separately prosecuted. (Tr. Vol. II, at 239-241.)
[3] Section 2.50 provides in part: "What you observe at the scene is not evidence, since conditions may have changed since the time of the events in this case. The evidence as to the physical appearance of the scene must come to you from the witness stand. The sole purpose of this viewing is to help you understand the evidence as it is presented during the trial."
[4] R.C. 4501.01 was amended by (2007) Sub. H.B. No. 9, effective October 18, 2007. Division (A) of former R.C. 4511.01 was unaffected by (2007) Sub. H.B. No. 9.
[5] At trial, the state had no objection as to qualifying Mr. Holland as an expert witness. (Tr. Vol. III, at 501.) However, according to the record, defendant did not seek to have Mr. Holland qualified as an expert witness, and the trial court did not expressly qualify Mr. Holland as an expert witness. See, generally, Scott v. Yates (1994),71 Ohio St.3d 219, 221 (observing that while Evid. R. 702 permits expert testimony, "a threshold determination must first be made under Evid.R 104(A) concerning the qualifications of the witness to testify"). *Page 1